UNISTRUT CORPORATION et al.

v.

STATE of Rhode Island DEPARTMENT OF LABOR AND TRAINING, Through its Director, Adelita S. Orefice.

No. 2006–115–M.P.

Supreme Court of Rhode Island.

May 15, 2007.

Jessica Papazian–Ross, Esq., Providence, for Plaintiff.

Tedford Radway, Esq., Cranston, for Defendant.

Present: WILLIAMS, C.J., and GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

What constitutes an "apparatus * * * for carrying or using electricity" under G.L.1956 § 5–6–2? The Board of Examiners of Electricians (the board), the director of the Rhode Island Department of Labor and Training (labor department), and the Superior Court all determined that a steel support structure, erected by Unistrut Corporation (Unistrut), which was intended to support lighting and other electrical equipment is such an apparatus, and, therefore the law required that it be built by licensed electricians. Unistrut disagreed, and petitioned this Court for a writ of certiorari. We granted that petition, and, for the reasons set forth in this opinion, we quash the judgment of the Superior Court.

## I

### Facts and Procedural History

When Rhode Island Hospital was building a new emergency room, the general

contractor on the project contracted with Capco Steel to do much of the framing work. Capco Steel, in turn, hired Unistrut to erect a steel support system upon which certain surgical equipment, including lighting, would be mounted. The record reveals that Unistrut had been using carpenters to install these systems in buildings, including hospitals for more than sixty years. This particular job, however, did not prove to be uneventful.

During construction, Ron Leddy, an office manager for Local 99 of the International Brotherhood of Electrical Workers, telephoned Glenn Dusablon, Chief Electrical Investigator for the labor department, to complain that Unistrut employees were performing electrical work without the proper license or permit. Dusablon's investigation of the construction of the steel support structure led him to conclude that Leddy was correct, and so he issued notices of violation to four individuals at the job site, Scott Waage, the project manager, and Raymond Parent, Mark Watson and Dean Wheeler (collectively, petitioners), on September 30, 2004.

Undeterred, Unistrut continued the construction, despite the notices that the work was in violation of the law. Consequently, Dusablon issued two more violations to petitioners on October 1 and 6, 2004, which similarly failed to dissuade Unistrut from continuing the assembly of the support structure.

The next thrust in this conflict consisted of cease-and-desist orders issued by Kathryn G. Serrecchia, assistant director of the labor department. These orders sought not only to halt the construction of the steel support system, but also purported to levy fines for the violations of § 5-6-2, under § 5-6-32.[1] Cease-and-desist orders were issued to each of the petitioners on October 5, 7 and 8, 2004; the accompanying fines totaled $19,200.[2] Nonetheless, following the advice of counsel, Unistrut completed the construction of the steel support structure.

The petitioners did not take the actions against them lying down; they appealed both the fines and the cease-and-desist orders to the director of the labor department (the director). Pursuant to § 5-6-32,[3] a hearing was held before the board[4]

1. General Laws 1956 § 5-6-32 says:

"(a) The director may assess an administrative penalty on any person, firm, or corporation for any violation of the provisions of this chapter, after notice and a hearing, before and upon the recommendation of the board of examiners of electricians in the amount of five hundred dollars ($500) for the first violation and nine hundred fifty dollars ($950) for a subsequent violation. All funds collected by the labor and training department under this section shall be placed in the restricted receipts account created pursuant to § 28-22-1.1. This section is in addition to any other action provided by law for violations of this chapter.

"(b) The chief of the section shall act as an investigator with respect to the enforcement of all the provisions of law relative to the licensing of electricians and, to this effect, whenever a complaint is made by the chief of the section to the director of the

department of labor and training or his or her designee that the provisions of this chapter are being violated, the director of the department of labor and training or his or her designee may issue an order to cease and desist from that violation and may impose the above penalties against the violator and against the contractor."

2. Scott Waage was fined for five violations per day as the project manager, and his fines totaled $12,000. Raymond Parent, Mark Watson, and Dean Wheeler were fined for one violation per day, and their fines totaled $2,400 each.

3. Although § 5-6-32 does not call for a hearing before the board for appeals of the decisions of the labor department, it does require that a hearing be held before the board before the fines are levied so that the board can give the director a recommendation.

on November 17, 2004. At that hearing, the board heard testimony from Dusablon, David Cenci, chief electrical inspector for the City of Providence, David Riley, a municipal electrical inspector who worked on the Rhode Island Hospital job, Scott Patchan, national sales manager for Unistrut, and Scott Waage, the project manager.[5] The record of the hearing reveals that the purpose of the steel structure Unistrut built was to support lights and other electrical equipment in the emergency room, which equipment would be attached by E.W. Audet & Sons, Inc., an electrical contractor. Also, it seems clear from the record that at the time Unistrut completed its work no electrical components had been installed on the structure. Finally, the record of the hearing established that the electrical code requires that electricians provide adequate support for any electrical devices, fixtures, or appliances they install.

Based on this testimony, the board made the following findings: (1) that the structure that Unistrut built was an "apparatus * * * for carrying or using electricity" as described in § 5–6–2;[6] (2) that Unistrut was required to obtain an electrical permit to install the structure; and (3) that the workers who installed the structure were required to be licensed electricians. Consequently, the board recommended to the director that both the cease-and-desist orders and the fines be enforced.[7] The director accepted the board's recommendation and affirmed both the cease-and-desist orders and the fines for all four petitioners in separate decisions, all of which were issued on December 10, 2004.[8]

4. Among the members of the electricians board who conducted the hearing was Allen Durand, a business agent for Local 99 of the electrical workers' union. The attorney for Unistrut requested that Durand recuse himself from the hearing, but Durand declined.

5. Not insignificantly, counsel for the four petitioners said at the hearing that he represented each of them, "and also Unistrut, who hasn't been charged."

6. The text of § 5–6–2 says:
   "(a)(1) No person, firm, or corporation shall enter into, engage in, solicit, advertise, bid for, or work at the business of installing wires, conduits, apparatus, fixtures, electrical signs, and other appliances for carrying or using electricity for light, heat, fire alarms, as defined in chapter 28.25 of title 23, entitled 'fire alarm systems', or power purposes, exclusive of low voltage wiring for heating/refrigeration equipment, or work at the business of removing and reattaching existing electrical meters, unless that person, firm, or corporation shall have received a license and a certificate for the business, issued by the state board of examiners of electricians of the division of professional regulation of the department of labor and training in accordance with the provisions set forth in this chapter.

   "(2) That person shall carry this license on his or her person at all times while so engaged, and shall affix his or her contractor's license number to any advertisement and/or contract he or she executes and/or to any bid he or she files with any consumer for his or her professional services and to any applicable permit required for the performance of those services.

   "(b) Any person, firm or corporation which is required to apply for a permit from a local building official for any work required to be performed by a person licensed under the provisions of this chapter shall cause the work to be performed by a person licensed under the provisions of this chapter; provided, that the provisions of this section, except the provision regarding removing and reattaching existing electrical meters, shall not apply to owner-occupied single family homes."

7. Although the recommendation of the board does not mention either the cease-and-desist orders or the fines, but rather is a recommendation that the appeals be denied, we conclude that their recommendation encompassed both labor department actions.

8. The full text of each decision was exactly the same with the exception of the amount of the fine and the name of the appellant. The

Unistrut plodded on and perfected appeals of the administrative decisions to the Superior Court pursuant to G.L.1956 § 42–35–15.[9] In the appeals, Unistrut

decisions themselves did not mention the cease-and-desist orders. However, because the fines were levied simultaneously with the cease-and-desist orders, and the two penalties were, essentially, part and parcel of each other, we will consider the propriety of the cease-and-desist orders.

It is worth noting that the director of the labor department did not issue a decision with regard to Scott Waage's cease-and-desist orders, and accompanying fines. Instead, a decision was issued against Unistrut upholding the fines that had been assessed to Scott Waage. At no point in any of the proceedings is this fact mentioned, and, from this point forward, both Unistrut and Scott Waage are treated as parties to the case. For the sake of simplicity, we refer to the petitioners collectively as Unistrut.

9. General Laws 1956 § 42–35–15 sets out the procedure for an appeal to the Superior Court for a party aggrieved by a decision from an administrative body after all administrative remedies are exhausted and sets forth the circumstances under which such decisions may be reversed:

"(a) Any person, including any small business, who has exhausted all administrative remedies available to him or her within the agency, and who is aggrieved by a final order in a contested case is entitled to judicial review under this chapter. This section does not limit utilization of or the scope of judicial review available under other means of review, redress, relief, or trial de novo provided by law. Any preliminary, procedural, or intermediate agency act or ruling is immediately reviewable in any case in which review of the final agency order would not provide an adequate remedy.

"(b) Proceedings for review are instituted by filing a complaint in the superior court of Providence County or in the superior court in the county in which the cause of action arose, or where expressly provided by the general laws in the sixth division of the district court or family court of Providence County, within thirty (30) days after mailing notice of the final decision of the agency or, if a rehearing is requested, within thirty (30) days after the decision thereon, provided, however, that any person who is aggrieved by a final order concerning the assessment or determination of any tax, interest, or penalty made by the tax administrator must pay the amount of the tax, interest, or penalty to the administrator as a prerequisite to the filing of such complaint. Copies of the complaint shall be served upon the agency and all other parties of record in the manner prescribed by applicable procedural rules within ten (10) days after it is filed in court, provided, however, that the time for service may be extended for good cause by order of the court.

"(c) The filing of the complaint does not itself stay enforcement of the agency order. The agency may grant, or the reviewing court may order, a stay upon the appropriate terms.

"(d) Within thirty (30) days after the service of the complaint, or within further time allowed by the court, the agency shall transmit to the reviewing court the original or a certified copy of the entire record of the proceeding under review. By stipulation of all parties to the review proceedings, the record may be shortened. Any party unreasonably refusing to stipulate to limit the record may be taxed by the court for the additional costs. The court may require or permit subsequent corrections or additions to the record.

"(e) If, before the date set for hearing, application is made to the court for leave to present additional evidence, and it is shown to the satisfaction of the court that the additional evidence is material and that there were good reasons for failure to present it in the proceeding before the agency, the court may order that the additional evidence be taken before the agency upon conditions determined by the court. The agency may modify its findings and decision by reason of the additional evidence and shall file that evidence and any modifications, new findings, or decisions with the reviewing court.

"(f) The review shall be conducted by the court without a jury and shall be confined to the record. In cases of alleged irregularities in procedure before the agency, not shown in the record, proof thereon may be taken in the court. The court, upon request, shall hear oral argument and receive written briefs.

"(g) The court shall not substitute its judgment for that of the agency as to the

challenged the validity of the fines, arguing that petitioners did not receive a hearing before the monetary sanctions were levied, as is required by § 5–6–32.[10] Also, petitioners contended that the board erred when it determined that the installation of the steel support system was electrical work that required a license under the statute. In a written decision dated March 28, 2006, a magistrate of the Superior Court ruled that the fines were impermissibly levied because Unistrut had not been afforded a hearing before they were assessed.[11] However, he agreed with the labor department's conclusion that the steel support structure was an apparatus covered by § 5–6–2. Thus, he affirmed the issuance of the cease-and-desist orders.[12] Judgment was entered in accordance with that decision on April 3, 2006.

Still unwilling to accept defeat, Unistrut petitioned this Court for a writ of certiorari on April 13, 2006, challenging the portion of the magistrate's judgment that affirmed the board's construction of § 5–6–2 that included the steel support system built at Rhode Island Hospital within the definition of apparatus under the statute. This Court granted that petition on May 23, 2006. This case originally was argued before this Court on December 4, 2006, pursuant to an order directing the parties to appear and show cause why the case should not summarily be decided. After argument, we held that cause had been shown, and we directed the parties to submit full briefs and prepare further argument. The case finally reached us for plenary consideration on April 3, 2007.

## II

### Standard of Review

■ This Court is the final arbiter of questions of statutory construction, and such questions are subject to *de novo* review by this Court. *Marques v. Pawtucket Mutual Insurance Co.*, 915 A.2d 745, 747 (R.I.2007). When a statute is clear and unambiguous we are bound to ascribe the plain and ordinary meaning of the words of the statute and our inquiry is at an end. *Moore v. Ballard*, 914 A.2d 487, 490 (R.I.2007). However, when a statute is susceptible of more than one meaning,

weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

"(1) In violation of constitutional or statutory provisions;

"(2) In excess of the statutory authority of the agency;

"(3) Made upon unlawful procedure;

"(4) Affected by other error or law;

"(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

"(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."

10. Section 5–6–32 allows the department to issue fines for violations, but it requires that a

hearing be held before the fines are issued. ("The director may assess *an administrative penalty* on any person, firm, or corporation for any violation of the provisions of this chapter, *after notice and a hearing*." Section 5–6–32(a) (emphases added)).

11. This portion of the magistrate's decision is not before us on this writ of certiorari.

12. In his decision, the magistrate did not mention the cease-and-desist orders at all. However, after he concluded that the fines were void because the labor department failed to afford petitioners the process required by the statute, he made a separate holding in which he "uph[e]ld the conclusion that plaintiffs were performing electrical work without a license." We read this portion of his holding as an affirmation of the cease-and-desist orders.

we employ our well-established maxims of statutory construction in an effort to glean the intent of the Legislature. *Tanner v. Town Council of East Greenwich*, 880 A.2d 784, 796 (R.I.2005). Furthermore, when the administration of a statute has been entrusted to a governmental agency, deference is due to that agency's interpretation of an ambiguous statute unless such interpretation is clearly erroneous or unauthorized. *Arnold v. Rhode Island Department of Labor and Training Board of Review*, 822 A.2d 164, 169 (R.I.2003). But, when a statute is clear and unambiguous, we are not required to give any deference to the agency's reading of the statute.

■ "[A] case is moot if the original complaint raised a justiciable controversy, but events occurring after the filing have deprived the litigant of a continuing stake in the controversy." *School Committee of Johnston v. Santilli*, 912 A.2d 941, 942 (R.I.2007) (mem.) (quoting *In re New England Gas Co.*, 842 A.2d 545, 553 (R.I. 2004)). This Court will not entertain moot cases unless they concern important rights, and the controversy is capable of repetition and will evade review. *Krivitsky v. Town of Westerly*, 823 A.2d 1144, 1146-47 (R.I.2003).

### III

### Analysis

■■ We note at the outset, and although it was not briefed or argued by either side, that this controversy is clearly moot. The construction project that precipitated this conflict has been completed. Thus, the cease-and-desist orders issued in an effort to stop that construction are of no import. Furthermore, the fines assessed by the labor department were vacated by the Superior Court, and that action has not been challenged here. As a result, neither party has a current stake in the outcome. *See Santilli*, 912 A.2d at 942. Therefore, before we reach the merits of this case, we first must address whether this controversy concerns important rights that are capable of repetition while evading review. *See Krivitsky*, 823 A.2d at 1146-47. What is before us involves the right of individuals to earn a livelihood, arises in a situation certainly capable of repetition, and is likely to evade review because of the short period in which construction of these support systems is completed. Consequently, it is our opinion that this case should be reviewed despite its mootness. *Cf. id.* at 1147 (finding the case not moot because the license at issue would not have expired by the time of oral argument). Accordingly, we now turn to the question of whether the magistrate made an error of law when he affirmed the board's interpretation of § 5-6-2.

When the board reached its decision, it relied heavily on the requirement, found in the National Electric Code, that an electrician provide adequate support for anything he installs.[13] Also, because the word "apparatus" is not defined by the statute, the board adopted a dictionary definition of that term, and it determined that the structure built by petitioners fit into that definition. Thus, because § 5-6-2 requires a licensed electrician to install an apparatus for carrying electricity, and because electricians are required to adequately support their electrical work, the board reached the conclusion that § 5-6-2 requires anyone installing an apparatus

---

13. According to § 5-6-26, any rules adopted for electrical work must be based on some definite edition of the National Electric Code. According to the testimony at the hearing before the board, it was the 2002 edition of the National Electric Code that was adopted into the Rhode Island Building Code.

that supports electrical fixtures be a licensed electrician.

When the magistrate reviewed the decision in the Superior Court appeal, he also examined the meaning of the word "apparatus." In doing so, he consulted several dictionary definitions as well as a Ninth Circuit case in which the court decided whether a softball field, basketball court, and skating rink were "apparatus[es] intended for the recreation of children." *United States v. Migi*, 329 F.3d 1085, 1087 (9th Cir.2003). In that case, the Ninth Circuit defined apparatus as "a collection or set of materials * * * [or] * * * appliances * * * designed for a particular use." *Id.* at 1088 (quoting Webster's Third New International Dictionary 102 (unabridged 1986)).[14] Based on these definitions of the disputed term, the magistrate affirmed the agency interpretation of § 5–6–2 to include the Unistrut support within the definition of apparatus for carrying electricity, the installation of which must be by a licensed electrician.

Two cases decided by this Court discuss the process that this Court uses when addressing a question of statutory interpretation in the face of an agency interpretation of the statute: *Labor Ready Northeast, Inc. v. McConaghy*, 849 A.2d 340 (R.I.2004), and *Rossi v. Employees' Retirement System*, 895 A.2d 106 (R.I.2006).

*McConaghy*, 849 A.2d at 342, involved a dispute about whether Labor Ready was operating a check cashing business, and, therefore, was required to obtain a license from the Department of Business Regulation (DBR). Labor Ready, which operated a day-laborer agency, gave its employees an option of receiving their pay in the form of a voucher in lieu of a check. *Id.* Employees would insert these vouchers into a cash-dispensing machine, and they would receive their pay in currency, less one dollar and any change contained on the voucher, which was retained by Labor Ready as a service fee. *Id.* The critical question was whether the vouchers issued by Labor Ready met the definition of the term "instrument" under the check-cashing statute. *Id.* at 345. The DBR, the agency charged with administering the statute, had determined that the vouchers fell within the definition, but the Superior Court reversed that determination on appeal. *Id.* at 343. In the course of our review, we determined that the term "instrument" was ambiguous and capable of more than one reasonable interpretation, and, as a result, the DBR's interpretation was entitled to deference and, therefore, should not have been reversed by the Superior Court because it was not clearly erroneous. *Id.* at 345–46.

*Rossi*, 895 A.2d at 108, involved a plaintiff who applied for an accidental disability pension from the State of Rhode Island. She had suffered a job-related injury, and had been out of work for a period of years before returning to her job. *Id.* When she did, she found that the day-to-day activities of the job aggravated her previous injuries to the point that she was unable to continue working. *Id.* at 109. When the retirement board reviewed her application for a disability pension, it interpreted the statute to require that the application be made within five years of the injury, or

---

**14.** The magistrate's decision overlooked one important aspect of the Ninth Circuit case. The statute in that case modified the word apparatus with the phrase "intended for the recreation of children." *United States v. Migi*, 329 F.3d 1085, 1087 (9th Cir.2003). When the court reached the conclusion that the soft- ball field, basketball court and skating rink were apparatuses, it did so because it reasoned that they were sets of "materials or appliances designed for recreational use." *Id.* at 1088. Thus the "particular use" described by the dictionary definition was defined by the statute.

within three years of a specific incident that reaggravated the injury. *Id.* Because her original injury was more than five years old and because she could not point to a specific incident within the previous three years that gave rise to her renewed disability, the retirement board rejected her claim. *Id.* The Superior Court affirmed that decision. *Id.* On appeal, we held that the retirement board had interpreted the statute erroneously to require a specific incident of reaggravation, and, as such, had failed to interpret the term "aggravate" to mean something different from "reinjure." We held that such an interpretation was clearly wrong because the statute used the terms "aggravate" and "reinjure" each as triggering events for the application of the statute, and to interpret "aggravate" to have the same definition as "reinjure" would make the use of the two terms redundant. *Id.* at 113. Therefore, we held that the Legislature clearly and unambiguously intended to create two different circumstances that would trigger the three-year period for applying for a pension when a previous on-the-job injury returns to prevent an employee from working. *Id.* Therefore, we did not give deference to the agency's interpretation, and we reversed the judgment of the Superior Court and remanded the case to the retirement board for reconsideration of her application. *Id.* at 113–14.

In the case now before us, both the board and the Superior Court have interpreted the word apparatus, and have determined that the Unistrut support structure is an apparatus under the statute. We disagree. This is not a case in which we are faced with a statute susceptible of multiple reasonable meanings, and therefore are required to give deference to the agency interpretation. *See McConaghy,* 849 A.2d at 345–46. There is no dispute that the structure erected by Unis-

trut was an apparatus. However, the question that must be resolved is whether the Unistrut structure was an "apparatus * * * for carrying or using electricity." Neither the board nor the Superior Court addressed that issue. Instead, the board determined that the fact that the Unistrut structure was an apparatus intended to support electrical work, coupled with the requirement that electricians adequately support their installations resulted in the conclusion that this structure was an "apparatus * * * for carrying or using electricity" under § 5–6–2. "[T]he true measure of a court's willingness to defer to an agency's interpretation of a statute 'depends, in the last analysis, on the persuasiveness of the interpretation, given all the attendant circumstances.'" *United States v. 29 Cartons of * * * an Article of Food,* 987 F.2d 33, 38 (1st Cir.1993) (quoting *Massachusetts Department of Education v. United States Department of Education,* 837 F.2d 536, 541 (1st Cir.1988)). In our opinion, because the administrative body interpreted the term apparatus out of context and only in its general sense, and not as an "apparatus for * * * carrying or using electricity," the judgment of the Superior Court must be reversed. *See Rossi,* 895 A.2d at 113–14.

Furthermore, our review of the statute leads us to conclude that the language of the statute is clear and unambiguous. In *Migi,* 329 F.3d at 1088, the Ninth Circuit determined that the basketball court, softball field and skating rink were apparatuses intended for recreational use because the plain and ordinary meaning of apparatus was a set of materials and appliances for a specific use, and that specific use—recreational purposes—was defined by the statute. Here, apparatus has the same plain meaning, and once again, the specific use is defined by the statute— carrying or using electricity. Support for

electrical equipment is not included as one of the uses of an apparatus that requires an electrician for installation in § 5–6–2. The uncontradicted testimony before the board established that when Unistrut completed its work no electrical components were attached to the structure. Thus, we hold that the statute clearly and unambiguously does not include within its ambit the work done by the carpenters employed by Unistrut, and the cease-and-desist orders must be vacated.

## IV

### Conclusion

For the reasons stated in this opinion, we quash the judgment of the Superior Court and order the return of the papers in this case thereto.