**REILLY ELECTRICAL
CONTRACTORS, INC.
d/b/a Relco, Inc. et al.**

v.

**STATE of Rhode Island DEPARTMENT
OF LABOR AND TRAINING, through
its director Adelita S. OREFICE.**

No. 2010–266–M.P.

Supreme Court of Rhode Island.

July 6, 2012.

Gerard R. Visconti, Esq., for Plaintiff.

Tedford B. Radway, Esq., Cranston, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice INDEGLIA, for the Court.

The issue presented in this petition is whether G.L.1956 § 5–6–2 permits only a licensed electrician to install underground hollow polyvinyl chloride (PVC) material that is devoid of any electrical wiring or conductors. The Board of Examiners of Electricians (the board), the Rhode Island Department of Labor and Training (DLT), and the Superior Court all determined that § 5–6–2 required a licensed electrician to perform such work. The petitioners, Reilly Electrical Contractors, Inc. (Relco), Michael McSheffrey, Robert Rutledge, John Brewer, and Ray Bombardier,[1] disagreed and petitioned this Court for a writ of

---

1. Michael McSheffrey, Robert Rutledge, John Brewer, and Ray Bombardier were, at that time, employees of Relco.

certiorari. Having granted the petition, this matter came before the Supreme Court on March 28, 2012, pursuant to an order directing the parties to appear and show cause why the issues raised should not be summarily decided. After hearing the arguments of counsel and reviewing the memoranda submitted on behalf of the parties, we are satisfied that cause has not been shown. Accordingly, we shall decide the case at this time without further briefing or argument. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

Having been selected as a subcontractor for an outdoor lighting project taking place at Rhode Island College, Relco's employees were installing PVC material beneath a soccer field on October 27, 2005. Although the hollow PVC material did not contain any electrical wiring at that time, the future purpose of the tubing was to house and protect electrical conductors and wiring. On that day, Robert Raimbault, the chief electrical inspector for the state, observed four men holding the PVC material over their heads as they fed it into the excavated ground. After questioning the men, Mr. Raimbault discovered that only one of the four men had a current Rhode Island electrician's license.[2] Consequently, DLT issued cease-and-desist orders and fines against the three unlicensed men (Mr. Bombardier, Mr. Brewer, and Mr. Rutledge) for performing electrical work without a license in violation of § 5–6–2, as discussed *infra*. The DLT also issued cease-and-desist orders and fines against Relco and Mr. McSheffrey[3] for allowing employees to perform electrical work without a license and for engaging in electrical work without a state permit, in violation of § 5–6–25.[4] Relco and its employees subsequently appealed these violations to the board.

On March 15, 2006, a hearing was held before the board (the first board hearing).[5] At that hearing, Mr. McSheffrey testified that on the day before the inspection, Relco applied for an electrical permit from the City of Providence. Mr. McSheffrey asserted that although the work taking place on the day of the inspection was not "electrical work," the material being handled was "a UL listed electrical product." He also referred to the PVC material as "electrical conduit."

Mr. Raimbault also acknowledged that the PVC material being handled by the Relco employees "was rated as electrical material[,]" and was "described in the elec-

---

**2.** In fact, one person was an electrician's apprentice in Massachusetts, one had an expired apprentice license, and one had no electrical credentials whatsoever.

**3.** Mr. McSheffrey, besides being a master electrician, was secretary and vice president of operations for Relco.

**4.** General Laws 1956 § 5–6–25 reads:
"All electrical work covered in this chapter, which is done in the state of Rhode Island and/or any city or town having rules and requirements for that work, shall be done in accordance with those rules and requirements. Failure of any licensee to do that work in that manner, or his or her failure

or refusal to correct the work with reasonable promptness after notice by local inspection or enforcement authorities where the notice is required by law, when reported to the division of professional regulation, shall be grounds for suspension or revocation of the license, in the discretion of the division after proper notice and a hearing before and upon the recommendation of the board of examiners of electricians to the director of labor and training."

**5.** This was the first of two board hearings conducted for petitioners' appeal. The second board hearing is discussed *infra*.

trical code." He also testified that although the PVC material did not contain any electrical conductors on the date of the inspection, the next step in the process would be to install electrical conductors within it. He further attested that the undertaking by Relco's employees was "standard electrical installation practice" and that the PVC material was not used to conduct air or water.

At the close of the first hearing, the board unanimously recommended that the director of DLT deny the appeal, which she did on April 20, 2006. Undeterred by the outcome of their administrative appeal, petitioners filed an appeal of DLT's decision in the Superior Court under G.L.1956 § 42–35–15.

After the filing of that appeal, however, DLT vacated the contested violations and fines based on due process concerns that the fines should not have been issued prior to a hearing. Thereafter, DLT reissued to Relco and its employees new notices of violation, based on the conduct of October 27, 2005, this time affording them the right to a hearing before any action took place. The petitioners again appealed the reissued notices to the board.

On February 20, 2008, a second hearing was held before the board (the second board hearing). The bulk of the evidence at this hearing was the record from the first board hearing, which the board reviewed. At the second board hearing, Mr. Raimbault confirmed that the PVC material in question was "consistent with the electrical conduit constructed of PVC material exclusively made for the electrical industry as listed and tested[.]" He further clarified that "it [was] electrical pipe

constructed of PVC [that] is not the type used for plumbing[.]"

After the second hearing, the board again unanimously recommended that the director of DLT affirm the violations for the events of October 27, 2005, which she did on February 25, 2008. The petitioners filed a timely appeal of this decision with the Superior Court by amending the prior complaint that they had previously filed.

On May 13, 2010, a hearing before a justice of the Superior Court was held on the matter. In their appeal before the hearing justice, petitioners asserted that the board's decision violated § 42–35–15 because it was arbitrary, capricious, and clearly erroneous. Specifically, petitioners argued that what took place on October 27, 2005, was merely preparatory work involving PVC "pipe" that by itself could not in any way conduct electricity. The petitioners, in their argument before the hearing justice, averred that the word "conduit" was something that in and of itself conducts electricity—such as an insulated wire or cord. Thus, the petitioners explained, because the PVC material handled by the Relco employees could not conduct electricity, it was not conduit at all, but rather "a protection device" used to protect wires—or in their view, conduit—that are subsequently threaded through the pipe.[6] The petitioners did concede that an electrical permit is required to install electrical conductors within the PVC material.

In a written decision issued on July 20, 2010, the hearing justice denied petitioners' appeal by ruling that the PVC material was conduit pursuant to § 5–6–2 and therefore an electrician's license and state permit were required for its installation.

---

**6.** Later in the hearing, however, petitioners' counsel acknowledged that the PVC material was "conduit," but not an "electrical conduit." However, counsel qualified this acknowledgment by arguing that although the PVC material may be considered conduit itself, it does not, by itself, conduct electricity. Rather, the electrical conductors that may be placed within it perform the actual carrying of electricity.

Final judgment was entered on July 29, 2010. On May 19, 2011, we granted the petition for writ of certiorari.

## II

### Standard of Review

This Court has frequently stated that, when considering an administrative appeal, "the scope of our review, like that of the Superior Court, is an extension of the administrative process." *Auto Body Association of Rhode Island v. State Department of Business Regulation*, 996 A.2d 91, 94 (R.I.2010) (quoting *Rhode Island Public Telecommunications Authority v. Rhode Island State Labor Relations Board*, 650 A.2d 479, 484 (R.I.1994)). "In conducting our review, 'we are restricted to questions of law, which we review *de novo.*'" *Id.* at 95 (quoting *Champlin's Realty Associates v. Tikoian*, 989 A.2d 427, 437 (R.I.2010)). "Accordingly, we give deference to the factual findings of the administrative agency." *Id.* (citing *Champlin's Realty Associates*, 989 A.2d at 437).

On certiorari, we do not weigh the evidence but rather, as an extension of the administrative process, we limit the scope of our review to the record as a whole "to determine whether [any] legally competent evidence exists" in it to support the trial court's decision. *Champlin's Realty Associates*, 989 A.2d at 437 (quoting *Sartor v. Coastal Resources Management Council*, 542 A.2d 1077, 1082–83 (R.I.1988)). "Legally competent evidence is defined as 'such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance.'" *Foster–Glocester Regional School Committee v. Board of Review*, 854 A.2d 1008, 1012 (R.I.2004) (quoting *Rhode Island Temps,*

*Inc. v. Department of Labor and Training, Board of Review*, 749 A.2d 1121, 1125 (R.I.2000)). "However, this Court has also stated that 'an administrative decision can be vacated if it is clearly erroneous in view of the reliable, probative, and substantial evidence contained in the whole record.'" *Auto Body Association*, 996 A.2d at 95 (quoting *Costa v. Registrar of Motor Vehicles*, 543 A.2d 1307, 1309 (R.I. 1988)).

## III

### Discussion

We begin our analysis by citing the portion of the Rhode Island statute at issue in this petition. Section 5–6–2, entitled "Work for which license required[,]" provides in pertinent part:

"(a)(1) No person, firm, or corporation shall enter into, engage in, solicit, advertise, bid for, or work at the business of installing wires, conduits, apparatus, fixtures, electrical signs, lightning protection equipment * * * and other appliances for carrying or using or generating electricity for light * * * or power purposes * * * unless that person, firm, or corporation shall have received a license and a certificate for the business, issued by the state board of examiners of electricians of the division of professional regulation of the department of labor and training in accordance with the provisions set forth in this chapter."

The single issue in this matter is whether the PVC material Relco and its employees handled was "conduit[ ] * * * for carrying * * * electricity" as described in § 5–6–2. If the PVC material was conduit to be used in that manner, as the board and the Superior Court determined, then Relco violated the statute and the citations it received were justified.

## 1

### Intended Purpose of PVC Material

The petitioners argue that the work performed on October 27, 2005, and observed by Mr. Raimbault, was not electrical in nature, but rather "excavation and other preparatory work." In support of this argument, petitioners cite testimony elicited at the first board hearing, at which Mr. Raimbault testified that the PVC material was hollow and that he did not see any electrical cords within it. The petitioners suggest that Mr. Raimbault made an unfounded assumption that the PVC material would be later used for an electrical purpose; specifically, the petitioners assert that "he was merely *assuming* that electrical conductors would at some later point be installed at [the] site." (Emphasis in original.)

A review of the record demonstrates to this Court that the PVC material handled on the date of the citations' issuance was conduit, inherently capable of carrying electricity, in that it would ultimately house and protect electrical conductors. At the first board hearing, a state inspector testified that Relco was "install[ing] electric conduit for some lighting at the soccer field." Mr. McSheffrey himself testified that the scope of Relco's subcontracting work at the soccer field was "[b]asically just track and field lighting." Also, on October 26, 2005, a day before the inspection, Relco applied for an electrical permit from the City of Providence that explicitly described the electrical work to be performed.[7]

Moreover, at the first board hearing, Mr. Raimbault testified that the PVC material Relco was installing in the ground was "used to carry electrical conductors." He further testified that in his profession, the next step after the PVC material is installed in the ground is to install the electric conductors.[8] Accordingly, the hearing justice, as did the board, found that Relco was installing PVC material "for the purpose of creating a conduit through which electrical wires would run for the purpose of lighting the * * * soccer field." We agree with these factual findings and will not disturb the determination that electrical conductors would be installed within the PVC material.[9]

## 2

### The *Unistrut Corp.* Precedent

The petitioners also contend that, as a matter of law, the Superior Court's decision was clearly erroneous because it contravenes this Court's holding in *Unistrut Corp. v. State Department of Labor and Training*, 922 A.2d 93, 101 (R.I.2007), in which we considered whether the installation of metal framing constituted an "apparatus" under § 5–6–2 sufficient to require installation by a licensed electrician. In that case, Unistrut was subcontracted to erect a steel framework in a hospital emergency room upon which lighting and other surgical equipment would be mounted.

---

7. On Relco's application for an electrical permit there was a space for the applicant to describe the work to be performed. A handwritten notation in the space provided, presumably written by a Relco employee, reads "[i]nstallation of a 250 amp service 277/480 volt * * * from new panel. Installation of 4 circuits[, one] for each pole light."

8. At the Superior Court hearing, petitioners' attorney also acknowledged that electrical conductors would be installed in the PVC materials at some point in the future, and that such installation would require an electrician's license.

9. It is not lost on the Court that Relco's corporate name itself (Reilly Electrical Contractors, Inc.) further supports our holding that the work for which they were hired to perform was fundamentally electrical in nature.

The extent of Unistrut's work was limited to erecting the steel structure; it did not install any electrical components. In fact, a different electrical contractor, not a party to the case, was hired to do all of the electrical work. Although carpenters performed the installation of the steel structure, DLT cited Unistrut because the workers installing the framing were not licensed electricians in violation of § 5-6-2. Following a similar procedural path as the present matter, Unistrut ultimately sought review by this Court after the citations were upheld by the board and the Superior Court.[10] *See generally Unistrut Corp.*, 922 A.2d at 94–98.

In *Unistrut Corp.*, we disagreed with the board and the Superior Court's interpretation of the statute and held that "the administrative body interpreted the term apparatus out of context and only in its general sense[.]" *Unistrut Corp.*, 922 A.2d at 101. This Court determined that "the plain and ordinary meaning of apparatus was a set of materials and appliances for a specific use"—and that according to § 5-6-2, "the specific use [of an apparatus] is defined by the statute [as] carrying or using electricity." *Unistrut Corp.*, 922 A.2d at 101. We concluded that because apparatus had such a broad general definition, its correct interpretation in the statute could only be "an 'apparatus for * * * carrying or using electricity,'" and "that the statute * * * [did] not include within

its ambit the work done by [Unistrut's] carpenters" because "when Unistrut completed its work no electrical components were attached to the structure." *Id.* at 101, 102. Therefore, we ruled that a licensed electrician is only required to install an apparatus if that apparatus carries or uses electricity. *Id.* at 101.

Although there are similarities between *Unistrut Corp.* and this case, there are also discrete differences, and we are satisfied that the hearing justice was correct in her determination that *Unistrut Corp.* does not apply to the present matter.[11] We start by noting the scope of work that the subcontractors in both cases were contracted to perform. In *Unistrut Corp.*, the petitioners' work was complete after its employees erected the non-electrical framework; the installation of all the lighting and electrical components was to be accomplished by a separate electrical subcontractor. *Unistrut Corp.*, 922 A.2d at 96. Here, Relco is an electrical subcontractor, and its task included not only initially installing the PVC material, but also installing electrical conductors.

More importantly, unlike *Unistrut Corp.*—where a clear definition of apparatus was lacking, leading the board and the Superior Court to apply an erroneously broad definition—here, a certain meaning of conduit is readily apparent from the

---

10. To support their position, petitioners also cite an unpublished decision of the Superior Court that vacated DLT citations issued to a subcontractor for installing a lightning protection system, allegedly in violation of an earlier rendition of G.L.1956 § 5-6-2. *Northeast Lightning Protection Systems, Inc. v. State Department of Labor and Training*, 2006 WL 13117 (R.I.Super. January 3, 2006). The wording of § 5-6-2 in effect at the time did not include the wording "lightning protection equipment," and thus the court found that the board "unreasonably modifie[d] the statute by expanding its applicability beyond that which

the [L]egislature intended." Interestingly, the statute was subsequently amended to specifically require anyone installing "lightning protection equipment" to be a licensed electrician. *See* P.L. 2006, ch. 208, § 1 (effective January 1, 2007). Unlike *Northeast*, the issue in the case at bar involves the installation of a material explicitly identified in the statute in effect at the time of the citation, as discussed *infra*.

11. In fact, the word "conduits" immediately precedes apparatus in § 5-6-2, quoted *supra*.

contents of the record. In *Unistrut Corp.*, we held that because the board and the Superior Court improperly "interpreted the term apparatus out of context and only in its general sense," the citations issued must be vacated.[12] *Unistrut Corp.*, 922 A.2d at 101. In the case at bar, however, we hold that the word conduit, as used in § 5–6–2, does not possess such a generic definition. Indeed, the record provides sufficient evidence to support the Superior Court's definitional finding.

As the hearing justice noted, the National Electrical Code (NEC)[13] defines "Rigid Polyvinyl Chloride *Conduit* " as "[a] rigid nonmetallic *conduit* * * * of circular cross section, with integral or associated couplings, connectors, and fittings for the installation of electrical conductors and cables." *National Electrical Code Handbook*, Art. 352 at 401 (11th ed.2008). (Emphases added.) Indeed, the NEC devotes an entire article to "the use, installation, and construction specifications for rigid polyvinyl chloride conduit (PVC) * * *." *Id.* Art. 352.1 at 401. Furthermore, the NEC regulates not only the construction specifications of PVC conduit, but also its permitted uses (which include under-

ground installation), its size, the number of conductors allowed within it, the number of bends allowed, how it is to be trimmed, and how it is to be secured and supported. *See generally id.* at 401–05. To the contrary, this Court is unable to locate a comparable definition or series of regulations pertaining to an apparatus in the NEC.

Moreover, testimony at the first and second board hearings also reaffirms that the PVC material in the present matter was PVC conduit that is specifically manufactured and designed to carry electricity. At the first hearing before the board, both Mr. McSheffrey and Mr. Raimbault described the PVC material as "electrical *conduit.*" (Emphasis added). Mr. McSheffrey himself conceded that the PVC material handled by his employees was "a UL listed electrical product[.]" Mr. Raimbault also acknowledged that the PVC material was "rated as electrical material[,]" that it was "the standard 10–foot gray lengths of conduit which we know as electrical conduit[,]" and that what he observed the Relco employees performing was "standard electrical installation practice[.]"[14] Finally, a specific dictionary def-

12. In *Unistrut Corp.*, we noted that the Superior Court magistrate, in searching for a definition of apparatus, relied on a Ninth Circuit case that defined the term as "a collection or set of materials * * * [or] * * * appliances * * * designed for a particular use." *Unistrut Corp. v. State Department of Labor and Training*, 922 A.2d 93, 100 (R.I.2007) (quoting *United States v. Migi*, 329 F.3d 1085, 1088 (9th Cir.2003)). We held that the magistrate, in using this definition to affirm the board's decision, overlooked the critical fact that the statute in the Ninth Circuit case "modified the word apparatus with the phrase 'intended for the recreation of children.' " *Id.* at 100 n. 14 (quoting *Migi*, 329 F.3d at 1087). Although § 5–6–2 similarly modified the term apparatus with the wording for "carrying or using electricity[,]" in *Unistrut Corp.*, "[n]either the board nor the [magistrate] addressed that issue." *Unistrut Corp.*, 922 A.2d at 101.

Accordingly, this Court vacated the magistrate's decision partly because his decision failed to take into consideration the modifying language of § 5–6–2.

13. As the first standardized U.S. electrical code, the National Electrical Code is now used in all fifty states and all U.S. territories. *National Electrical Code Handbook*, Preface at ix. (11th ed.2008).

14. The board, in an apparent effort to distinguish the PVC conduit at issue from commonplace PVC pipe, made the following inquiry of Mr. Raimbault at the first board hearing:

"[THE BOARD]: The PVC conduit which is listed to carry electric conductors, could you put air into that conduit? Can that conduit be used for air travel?
"MR. RAIMBAULT: No.

inition of conduit includes "[a] tube or duct for enclosing electric wires or cable." The American Heritage Dictionary of the English Language, 384 (4th ed.2009).

■ As we held in *Unistrut Corp.*, the language of § 5–6–2 is clear and unambiguous. *Unistrut Corp.*, 922 A.2d at 101. "It is well settled that when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *Iselin v. Retirement Board of the Employees' Retirement System of Rhode Island*, 943 A.2d 1045, 1049 (R.I.2008) (quoting *Accent Store Design, Inc. v. Marathon House, Inc.*, 674 A.2d 1223, 1226 (R.I.1996)).

■ A plain reading of § 5–6–2 supports the DLT's citations imposed upon Relco. The operative word in the statute is "for," as it signals when a licensed electrician is needed. As it is written, a licensed electrician is required to install any conduit when the purpose of such conduit is "*for* carrying * * * electricity[.]" Section 5–6–2 (emphasis added). Clearly, the PVC conduit in this case was not to be used for the passage of air or water, but specifically for the carrying of electrical conductors and electricity. Further, we agree with the hearing justice that the petitioners' argument—that the PVC conduit in question did not fall under § 5–6–2 because no wires or conductors were present within the PVC conduit itself—would reduce the term conduit in the statute to "mere surplusage." *In re Harrison*, 992 A.2d 990, 994 (R.I.2010) (holding that "no construction of a statute should be adopted that would demote any significant phrase or clause to mere surplusage." (quoting *State v. Clark*, 974 A.2d 558, 572 (R.I. 2009))).

The substantial record developed below establishes convincingly that the PVC material being installed by the petitioners was conduit for the carrying of electricity pursuant to § 5–6–2, and because the meaning of conduit is certain and specific, our holding in *Unistrut Corp.* does not apply.

## IV

### Conclusion

■ "When deciding a case on certiorari, our task is 'to discern whether any legally competent evidence supports the lower tribunal's decision and whether the decision[-]maker committed any reversible errors of law in the matter under review.'" *Pierce v. Providence Retirement Board*, 962 A.2d 1292, 1292 (R.I.2009) (mem.) (quoting *Pastore v. Samson*, 900 A.2d 1067, 1073 (R.I.2006)). For the reasons stated herein, we hold that the Superior Court's decision in the present matter was factually supported by the record and did not constitute an error of law.

Accordingly, the petition for certiorari is denied. The judgment of the Superior Court is affirmed, and the papers in this case may be remanded to the Superior Court with our decision endorsed on it.

"[THE BOARD]: Can that conduit be used for water?

"MR. RAIMBAULT: No."