Margaret R. CHAMBERS

v.

Cassandra B. ORMISTON.

No. 2006–340.

Supreme Court of Rhode Island.

Dec. 7, 2007.

Louis M. Pulner, for Margaret R. Chambers.

Nancy A. Palmisciano, Providence, for Cassandra B. Ormiston.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice ROBINSON for the Court.

The Family Court, a legislatively created court of limited jurisdiction,[1] acting pursuant to G.L. 1956 § 9–24–27, has certified the following question to this Court:

> "May the Family Court properly recognize, for the purpose of entertaining a divorce petition, the marriage of two persons of the same sex who were purportedly married in another state?"

For the reasons set forth herein, it is our opinion that the certified question must be answered in the negative.[2]

### Facts and Travel

On May 26, 2004, Rhode Island residents Margaret Chambers and Cassandra Ormiston[3] traveled to Massachusetts and applied for a marriage license in that state. After Ms. Chambers and Ms. Ormiston received a marriage license, a Massachusetts justice of the peace performed a marriage ceremony in Fall River, Massachusetts. The couple thereafter returned to Rhode Island, where they resided together until they decided to seek to dissolve in

---

1. *State v. Kenney*, 523 A.2d 853, 854 (R.I. 1987) ("[T]he Family Court is a court of limited jurisdiction whose powers are strictly limited to those conferred by the Legislature."); see also *State v. Day*, 911 A.2d 1042, 1049 (R.I.2006) ("[T]he Family Court is a court of limited statutory jurisdiction * * *.") (Internal quotation marks omitted.); *Pierce v. Pierce*, 770 A.2d 867, 870 (R.I.2001); *State v. Zittel*, 94 R.I. 325, 329–30, 180 A.2d 455, 457 (1962).

2. We are sensitive to the fact that our holding on the jurisdictional issue deprives the parties to this case of the opportunity to seek a divorce in our Family Court. (*See* discussion entitled "A Final Consideration," *infra*.) Nevertheless, it is our conviction that the pertinent statute does not authorize the Family Court to entertain a divorce petition filed by "two persons of the same sex who were purportedly married in another state."

3. Ms. Chambers and Ms. Ormiston are of the same sex.

this state the relationship that Massachusetts deems to be a marriage[4] and that had been solemnized by the Massachusetts justice of the peace.

On October 23, 2006, Ms. Chambers filed a petition for divorce in the Family Court, and on October 27 of that year Ms. Ormiston filed an answer and counterclaim. Thereafter, on December 11, 2006, the Chief Judge of the Family Court certified to this Court a question as to whether or not the Family Court has subject matter jurisdiction to grant a petition for divorce with respect to a same-sex couple.

We considered the Family Court's certified question in conference on January 4, 2007 and again on January 10, 2007, and we determined at that point that our consideration of the certified question required that the Family Court make further findings of fact. While retaining jurisdiction, we remanded the matter to the Family Court and directed that it address several questions of fact. We also directed the certifying justice of the Family Court, based on his findings of fact, to determine: (1) whether or not the case presented an actual case or controversy; (2) whether or not the Full Faith and Credit Clause of the United States Constitution was relevant to the case; and (3) whether or not the Defense of Marriage Act, 28 U.S.C. § 1738C (2000), was pertinent to the case. This Court further directed that the Family Court reword the certified question to clarify that the issue was whether the Family Court could recognize the purported marriage for the purpose of entertaining a divorce petition. *Chambers v. Ormiston*, 916 A.2d 758, 758–59 (R.I.2007) (mem.). The Family Court responded to our request on February 21, 2007. The court's response set forth its conclusion that the case presented an actual case or controversy, that the Full Faith and Credit Clause was relevant, and that the Defense of Marriage Act had only "nominal" effect.

On October 9, 2007, after reviewing the briefs filed by the parties, as well as the briefs of a number of *amici curiae*, we heard oral argument from the parties with respect to the certified question.[5]

**Introduction**

Upon contemplating the question certified by the Family Court, it became clear to us that the precise issue we must decide is ultimately the following: What is the meaning of the word "marriage" within the Rhode Island statute[6] that empowers the Family Court to grant divorces-or, stated even more precisely, what did the word mean at the time that the members of the General Assembly enacted the statute? It is imperative that we direct our attention to the meaning of this statutory term at that point in time. We are well aware that "[t]his Court is the final arbiter with respect to questions of statutory construction." *New England Expedition–Providence, LLC v. City of Providence*, 773 A.2d 259, 263 (R.I.2001); *see also Unistrut Corp. v. State Department of Labor and Training*, 922 A.2d 93, 98 (R.I.2007). In carrying out that responsibility, we are mindful of the principle that our role is to determine the intent of the General Assembly by looking to "the language, na-

---

**4.** *See Goodridge v. Department of Public Health*, 440 Mass. 309, 798 N.E.2d 941 (2003) (plurality opinion).

**5.** We wish to thank the several *amici curiae* for the well-written and instructive briefs that they submitted to this Court.

**6.** General Laws 1956 § 8–10–3(a) reads in pertinent part as follows: "There is hereby established a family court, consisting of a chief judge and eleven (11) associate justices, to hear and determine all petitions for *divorce from the bond of marriage* * * *."* (Emphasis added.)

ture, and object" of the enactments of that body. *In re Estate of Gervais*, 770 A.2d 877, 880 (R.I.2001) (quoting *State v. Pelz*, 765 A.2d 824, 829–30 (R.I.2001)); *see also Pacheco v. Lachapelle*, 91 R.I. 359, 361–62, 163 A.2d 38, 40 (1960).

■■■ We have employed our customary procedure in approaching this particular question of statutory construction.[7] Pursuant to that procedure, we first attempt to see whether or not the statute in question has a plain meaning and therefore is unambiguous; in that situation, we simply apply that plain meaning to the case at hand. *See, e.g., State v. DiCicco*, 707 A.2d 251, 253 (R.I.1998); *Pacheco*, 91 R.I. at 361–62, 163 A.2d at 40. By contrast, if a statute is ambiguous, we must engage in a more elaborate statutory construction process, in which process we very frequently employ the canons of statutory construction. *See, e.g., Horn v. Southern Union Co.*, 927 A.2d 292, 294 (R.I.2007) (employing the *in pari materia* canon of statutory construction); *Kells v. Town of Lincoln*, 874 A.2d 204, 212 (R.I.2005) (employing the *in pari materia* canon); *State v. Dearmas*, 841 A.2d 659, 667 (R.I.2004) (employing the interpretive doctrine of *noscitur a sociis* in construing a provision of the Superior Court Rules of Criminal Procedure); *Berthiaume v. School Committee of Woonsocket*, 121 R.I. 243, 248, 397 A.2d 889, 893 (1979) (employing the interpretive principle that repeals by implication are disfavored); *see also Gorman v. Gorman*, 883 A.2d 732, 738 n. 9 (R.I.2005) (employing the *expressio unius est exclusio alterius* maxim in interpreting the meaning of a contract).

## Analysis

After initially addressing the issue of our own jurisdiction, we shall turn to the certified question itself and determine whether or not the language of the statute (understanding that language as did the legislators who enacted the statute) has a plain meaning and so is unambiguous. Thereafter, we shall consider the same language through the prism of the most relevant canon of statutory construction. Finally, we shall conclude by referencing certain highly relevant jurisprudential and public policy principles.

### I. This Court's Appellate Jurisdiction

■■■ In our judgment, this case is properly justiciable. By contrast with the federal courts, our jurisdiction is not limited by an inflexible constitutional "cases and controversies" requirement. *Rhode Island Ophthalmological Society v. Cannon*, 113 R.I. 16, 28, 317 A.2d 124, 130 (1974). Although it is our policy not to rule on abstract questions (*see id.* at 28, 317 A.2d at 130–31), we do not view the instant case as presenting an abstract question. Rather, the issue of Family Court jurisdiction *vel non*, which lies at the heart of this case, is an issue about which there is real controversy, and the resolution of that controversy will have

7. In his helpful treatise, *The Interpretation and Application of Statutes* 1–2 (1975), Professor Reed Dickerson observed:

   "The term 'statutory interpretation' itself is used to refer, on the one hand, solely to the cognitive process of ascertaining meaning and, on the other hand, to the entire process by which a court discharges its responsibility of applying statutes to specific controversies."

   In this opinion, we use the terms "statutory construction" and "statutory interpretation" in the broad sense as referring both to instances where we are able to determine that a given statute is unambiguous and to instances where we must engage in the more difficult task of ascertaining the meaning of an ambiguous statute so that we may apply it to the case at hand.

definite real-world consequences. In view of those considerations, and bearing in mind our general supervisory authority over the courts, we are convinced that it is proper for us to adjudicate this case. *See generally Vose v. Rhode Island Brotherhood of Correctional Officers,* 587 A.2d 913, 915 (R.I.1991).

## II. The Meaning of the Word "Marriage" in G.L. 1956 § 8–10–3(a)

■ The issue before us is rather narrow, and it can be decided entirely on the statutory level: Does G.L. 1956 § 8–10–3(a), the statute authorizing the Family Court to "hear and determine all petitions for divorce from the bond of marriage," empower that court to grant a divorce to the instant parties, who are described in the certified question as "two persons of the same sex who were purportedly married in another state?"

■ When we are called upon to decide what the General Assembly intended when it enacted a particular statute, we always begin with the principle that "[t]he plain statutory language is the best indicator of legislative intent." *State v. Santos,* 870 A.2d 1029, 1032 (R.I.2005) (citing numerous cases to the same effect).

■ It is clear to us that in this instance we are *not* confronted with an ambiguous statute. Therefore we simply must determine what the words in this statute were intended to mean. Once we have done so,

our interpretive task is at an end and our role is simply to apply the statute as written. *See Santos,* 870 A.2d at 1032; *DiCicco,* 707 A.2d at 253; *In re Denisewich,* 643 A.2d 1194, 1197 (R.I.1994).

■ It is a fundamental principle that "in the absence of statutory definition or qualification the words of a statute are given their ordinary meaning." *Pacheco,* 91 R.I. at 362, 163 A.2d at 40. What is crucial, however, is to determine the ordinary meaning *as of the time of enactment. See, e.g., St. Francis College v. Al–Khazraji,* 481 U.S. 604, 610, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987); *State v. Perry,* 336 Or. 49, 77 P.3d 313, 315–16 (2003).

■ Words can have different meanings at different points of historical time, but it is the role of the judiciary to ascertain what meaning a particular word had when the statute containing that word was enacted.[8] It is possible that today's members of the General Assembly might have an understanding of the term "marriage" that differs from the understanding of those legislators who enacted § 8–10–3(a) in 1961,[9] but our role is to interpret what was enacted and not to speculate as to what some other not-yet-enacted statute might say or mean. *See West Virginia University Hospitals, Inc. v. Casey,* 499 U.S. 83, 101 n. 7, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991) ("The will of Congress we look to is not a will evolving from Session to Session, but a will expressed

---

**8.** In one of his most quoted opinions, Justice Holmes wrote: "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances *and the time in which it is used." Towne v. Eisner,* 245 U.S. 418, 425, 38 S.Ct. 158, 62 L.Ed. 372 (1918) (emphasis added); *see also* Harry Willmer Jones, *Statutory Doubts and Legislative Intention,* 40 Colum. L. Rev. 957, 967 (1940) ("[A]ny serious effort on the part of judges to discover the thought or reference

behind the language of a legislative enactment must be based upon a painstaking effort to reproduce the setting or context in which the statutory words were employed.").

**9.** *See Rhode Island Central Credit Union v. Pazienza,* 572 A.2d 296, 297 (R.I.1990) ("The Family Court was created by the General Assembly at its January 1961 session with the passage of chapter 73 of the 1961 Public Laws.").

and fixed in a particular enactment.") (Internal quotation marks omitted.).

■ In carrying out the process of determining the meaning of the words employed by an enacting legislature, reference to contemporaneous dictionaries is appropriate and often helpful. *See, e.g., Gustafson v. Alloyd Co.,* 513 U.S. 561, 575, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (referencing the 1910 edition of Black's Law Dictionary in construing the term "prospectus" in the Securities Act of 1933); *St. Francis College,* 481 U.S. at 610–11, 107 S.Ct. 2022 (demonstrating, by citing to various nineteenth century dictionaries and encyclopedias, that the meaning of the word "race" at that time was different from what it is today); *Perry,* 77 P.3d at 315 (employing legal dictionaries from the 1920s and 1930s to determine the meaning of "place of business" as used in a statute enacted in that era).

With respect to the case at hand, there is absolutely no reason to believe that, when the act creating the Family Court became law in 1961,[10] the legislators understood the word marriage to refer to any state other than "the state of being united to a person of the opposite sex." The quoted words are the definition of marriage that is set forth in the 1961 edition of Webster's Third New International Dictionary of the English Language.[11] *Id.* at 1384. Similarly, the American College Dictionary, published in 1955, defines marriage as "the legal union of a man with a woman for life." *Id.* at 746. Likewise, Funk & Wagnalls Standard College Dictionary, published in 1963, defines marriage as, "[t]he state of being married; a legal contract entered into by a man and a woman, to live together as husband and wife." *Id.* at 829. In each case, the primary dictionary definition[12] of marriage refers only to a union between a man and a woman.[13]

10. We note that, although other provisions of the relevant statute have been amended since that time, the portion at issue in this case has remained unchanged.

11. We are in no sense disregarding Judge Learned Hand's advice that courts should not "make a fortress out of the dictionary." *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945). Instead, we have simply consulted dictionary definitions that are contemporaneous with the statute at issue in order to ascertain the meaning of the term "marriage" as understood by the legislators who enacted § 8–10–3(a) in 1961.

12. We believe that the primary dictionary definition normally expresses the "ordinary meaning" of the word being defined. *See Pacheco v. Lachapelle,* 91 R.I. 359, 361–62, 163 A.2d 38, 40 (1960). It is true that some of the subordinate definitions in the cited dictionaries indicate that the term "marriage" can be used in a metaphoric manner to describe a particularly close relationship; but there is no reason to believe that the legislators had such a metaphoric sense in mind when they enacted § 8–10–3(a). Moreover, there is absolutely

no indication in any of the dictionary definitions that a union between two persons of the same sex was any part of the definitional schema.

13. While recognized dictionaries suffice to reveal to us the plain and unambiguous meaning of § 8–10–3(a), we would arrive at precisely the same conclusion as to the statute's meaning if we employed the venerable maxim of *noscitur a sociis.* (We discuss the relevance of that maxim more fully in section III, *infra.*) The fact is that, when we consider the Rhode Island General Laws in their entirety, we note that our statutes consistently use gendered terms when referring to various aspects of marriage. *See, e.g.,* G.L. 1956 § 15–2–1 (referring to the "female party" and the "male party" in the context of applications for marriage licenses); § 15–2–7 (requiring the "bride and groom" to swear to the truth of what they state in filling out the application for marriage); *see also* G.L. 1956 § 15–1–1 (providing that "[n]o man shall marry" any one of a number of specified female relatives); § 15–1–2 (providing that "[n]o woman shall marry" any one of a number of specified male relatives); G.L. 1956 § 11–6–1 (employing

It is pertinent to note that Chief Justice Margaret Marshall, writing in 2003 for the plurality in *Goodridge v. Department of Public Health*, 440 Mass. 309, 798 N.E.2d 941 (2003), expressly acknowledged that the decision of the Supreme Judicial Court in that case *"marks a significant change in the definition of marriage* as it has been inherited from the common law, and understood by many societies for centuries." *Id.* at 965 (emphasis added).

As we understand the language of the existing divorce statute, it does not constitute "express language conferring subject-matter jurisdiction upon the Family Court" whereby it could entertain a divorce petition involving two persons of the same sex. *See State v. Kenney*, 523 A.2d 853, 854 (R.I.1987) (noting that the powers of the Family Court are "strictly limited to those conferred by the Legislature."). Moreover, "[i]n the absence of a clear legislative intent to the contrary, such jurisdiction cannot be inferred." *State v. Zittel*, 94 R.I. 325, 330, 180 A.2d 455, 458 (1962); *see also Kenney*, 523 A.2d at 854.[14]

We have concluded that § 8–10–3(a) is unambiguous, and we have ascertained its plain meaning by looking to the meaning of the word "marriage" at the time of the statute's enactment in 1961—some forty-six years ago. Once having arrived at that plain meaning,[15] our role is to apply it to the situation at hand. *DiCicco*, 707 A.2d at 253. The plain meaning of the word "marriage" in § 8–10–3(a) indicates to us that the Family Court is without jurisdiction to entertain the instant petition for divorce.

## III. The *Noscitur a Sociis* Canon of Statutory Construction

In the present instance, although we perceive *absolutely no ambiguity* in the statutory term "marriage," it is noteworthy that we would have reached the same result even if there were statutory ambiguity and we were required to consult the canons of statutory construction, which we very frequently consult to help guide us in determining the legislative intent that underlies ambiguous statutory language.[16]

In this case, well-established principles of statutory construction [17] would lead us

gendered terms in setting forth the elements of the crime of bigamy).

14. Both parties argue in their briefs that the common law concept of "comity" requires us to recognize their status as married for the purpose of granting them a divorce. It is our view, however, that considerations of comity (a largely discretionary and somewhat amorphous concept) do not come into play if the court lacks jurisdiction over the case before it. We have also concluded that, because our ruling as to the Family Court's lack of jurisdiction ends our inquiry, the Full Faith and Credit Clause of the United States Constitution is not relevant to these proceedings. Similarly, we have no occasion to address the applicability *vel non* of the Defense of Marriage Act, 28 U.S.C. § 1738C (2000).

15. The plain meaning rule need not be adhered to when it would bring about "an absurd result." *Kaya v. Partington*, 681 A.2d 256, 261 (R.I.1996). Our reading of the di-

vorce statute, however, does not produce an absurd result, but simply one that is less broad than some would prefer. It is now the role of the General Assembly to decide, if it chooses to do so, whether there should be a broader divorce statute.

16. Although in the ordinary case we would not engage in an analysis pursuant to a canon of statutory construction after we had found a statute to be unambiguous, we recognize that this is no ordinary case, and we believe that such an analysis would be informative and useful to the public at large in this instance.

17. We recognize that the canons of statutory construction are guides and not commandments. *See, e.g., Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961) (noting that "[t]he maxim *noscitur a sociis*, * * * while not an inescapable rule, is often wisely applied * * *"). Nevertheless, those canons are often extremely useful

ineluctably to conclude that the General Assembly has not granted the Family Court the power to grant a divorce in the situation described in the certified question. Above all, we have been guided by the principle that statutes are not to be read in a myopic manner but rather holistically and in context. *See State v. Badessa,* 869 A.2d 61, 65 (R.I.2005); *Park v. Ford Motor Co.,* 844 A.2d 687, 692 (R.I. 2004); *see also Davis v. Michigan Department of the Treasury,* 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."); *see also Alliance to End Repression v. City of Chicago,* 742 F.2d 1007, 1013 (7th Cir.1984) (en banc) (Posner, J.) ("It is a great fallacy to think that by staring hard at an isolated sentence one can come up with a meaningful interpretation. The sentence may look clear and yet if one understood its background and context one might read it quite differently from its superficially clear meaning."); *see generally Koons Buick Pontiac GMC, Inc. v. Nigh,* 543 U.S. 50, 60, 125 S.Ct. 460, 160 L.Ed.2d 389 (2004).

The *noscitur a sociis* principle of statutory construction is especially pertinent.[18] That principle counsels that "the meaning of questionable or doubtful words or phrases in a statute may be ascertained by reference to the meaning of other words or phrases associated with it." *State v. DiStefano,* 764 A.2d 1156, 1161 (R.I.2000) (internal quotation marks omitted); *see also Jones v. United States,* 527 U.S. 373, 389, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) ("Statutory language must be read in context and a phrase gathers meaning from the words around it.") (Internal quotation marks omitted.); *General Dynamics Land Systems, Inc. v. Cline,* 540 U.S. 581, 596, 124 S.Ct. 1236, 157 L.Ed.2d 1094 (2004); *Wigginton v. Centracchio,* 787 A.2d 1151, 1155 (R.I.2001).

Accordingly, we have looked to that broader context, and it is clear to us that the language used in several other statutes in the General Laws relating to marriage constitutes an extremely strong confirmatory indication that, in enacting § 8–10–3(a), the General Assembly had in mind only marriages involving two persons of the opposite sex. Many provisions in the General Laws that relate to marriage reflect an unspoken assumption on the part of the General Assembly that the status called "marriage" consists of the union of a man and a woman. *See, e.g.,* G.L. 1956 § 15–2–1 (referring to the "female party" and the "male party" in the context of applications for marriage licenses); § 15–2–7 (requiring the "bride and groom" to swear to the truth of what they state in filling out the application for marriage);

---

guides to us as we carry out our role as interpreters of statutes, and we have relied upon them with frequency in many different contexts. *See, e.g., State v. Oliveira,* 882 A.2d 1097, 1110 (R.I.2005) ("This Court reviews questions of statutory interpretation *de novo* * * *, and in undertaking this analysis, we apply our well-established maxims of statutory construction."); *see also Tanner v. Town Council of East Greenwich,* 880 A.2d 784, 796 (R.I.2005).

**18.** The Latin maxim can be translated into English as "[i]t is known by its associates."

*Latin for Lawyers* 195 (3rd ed. 1960). That same handbook paraphrases the maxim as follows:

"[W]here the meaning of a particular word is doubtful or obscure, or where a particular expression when taken singly is inoperative, the intention of a party who used it may frequently be ascertained by looking at adjoining words, or at expressions occurring in other parts of the same instrument." *Id.*

*see also* G.L. 1956 § 15–1–1 (providing that "[n]o man shall marry" any one of a number of specified female relatives); § 15–1–2 (providing that "[n]o woman shall marry" any one of a number of specified male relatives); G.L. 1956 § 11–6–1 (employing gendered terms in setting forth the elements of the crime of bigamy).

There are times, and this is one such time, where one may properly infer that the General Assembly considered something to be so obvious that no explicit statutory statement of definition was necessary. The overall statutory scheme reflects a legislative assumption that matrimony involves two people of different genders.

## IV.   The Proper Role of the Judicial Branch

As explained in Section II of this opinion, we have ascertained what the term "marriage" signified to the legislators who enacted the subject statute; in the words of a leading dictionary of that era, it meant "the state of being united to a person of the opposite sex." Webster's Third New International Dictionary of the English Language 1384 (1961). Having made that determination as to the statute's unambiguous meaning, our role is at an end; we have no constitutional authority to extend the scope of this or any other statute. *Citizens for Preservation of Waterman Lake v. Davis,* 420 A.2d 53, 57 (R.I.1980) ("It is well settled that when the language of a statute is clear and unambiguous, the statute may not be construed or extended but must be applied literally."). Indeed, this Court has in the past pointed to the limited statutory authority of the Family Court, and we have also indicated that it is not our role to supplement or amend a statute. *Waldeck v. Piner,* 488 A.2d 1218, 1220 (R.I.1985) (noting that the powers of the Family Court "are limited to those

expressly conferred upon it by statute: its jurisdiction cannot be extended by implication"); *see also Simeone v. Charron,* 762 A.2d 442, 448–49 (R.I.2000) ("[T]his Court will not broaden statutory provisions by judicial interpretation unless such interpretation is necessary and appropriate in carrying out the clear intent or defining the terms of the statute."); *Sindelar v. Leguia,* 750 A.2d 967, 972 (R.I.2000) ("[O]ur assigned task is simply to interpret the Act, not to redraft it * * *."); *see generally Dodd v. United States,* 545 U.S. 353, 359–60, 125 S.Ct. 2478, 162 L.Ed.2d 343 (2005) ("It is for Congress, not this Court, to amend the statute if it believes that [the statutory language leads to undesirable consequences]."); *Pinter v. Dahl,* 486 U.S. 622, 653, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988); *Pierce v. Pierce,* 770 A.2d 867, 872 (R.I.2001); *State v. Bryant,* 670 A.2d 776, 779 (R.I.1996); *Rhode Island Federation of Teachers v. Sundlun,* 595 A.2d 799, 802 (R.I.1991); *State v. Calise,* 478 A.2d 198, 201 (R.I.1984); *Little v. Conflict of Interest Commission,* 121 R.I. 232, 236–37, 397 A.2d 884, 887 (1979); *Gomes v. Rhode Island State Board of Elections,* 120 R.I. 951, 957, 393 A.2d 1088, 1091 (1978).

▮ The role of the judicial branch is not to make policy, but simply to determine the legislative intent as expressed in the statutes enacted by the General Assembly. *See, e.g., Little,* 121 R.I. at 237, 397 A.2d at 887; *State v. Patriarca,* 71 R.I. 151, 154, 43 A.2d 54, 55 (1945) ("[O]ur duty * * * is solely to construe the statute * * *."); *see also Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 188, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) ("Policy considerations cannot override our interpretation of the text and structure of the Act * * *."); *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 194, 98 S.Ct. 2279, 57 L.Ed.2d

117 (1978); *United States v. Great Northern Railway Co.,* 343 U.S. 562, 575, 72 S.Ct. 985, 96 L.Ed. 1142 (1952) ("It is our judicial function to apply statutes on the basis of what Congress has written, not what Congress might have written."); *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, * * * the sole function of the courts is to enforce it according to its terms."); *Civitarese v. Town of Middleborough,* 412 Mass. 695, 700, 591 N.E.2d 1091, 1095 (1992) ("We will not read into the plain words of a statute a legislative intent that is not expressed by those words.").

The case of *Pizza Hut of America, Inc. v. Pastore,* 519 A.2d 592 (R.I.1987), is especially instructive as to the relatively modest role of the judiciary. After construing a particular liquor control statute as expressing a legislative intent to benefit public and parochial schools, but not other types of schools, this Court stated:

"We believe that the Legislature intended to exclude private schools from the protection afforded by § 3–7–19. We are aware of the social intent of the legislation, and yet upon the peculiar facts of this case, we do not believe that this interpretation of the statute leads to an absurd result. If the court has not interpreted the statute in a manner consistent with the legislative intent to promote temperance, further societal response is the exclusive prerogative of the Legislature." *Id.* at 594.

In our judgment, when the General Assembly accorded the Family Court the power to grant divorces from "the bond of marriage," it had in mind only marriages between people of different sexes. Having said that, we remain mindful of the fact that, unlike a Constitutional Convention, the General Assembly meets every year. That body is free, if it so chooses, to enact divorce legislation that it might possibly deem more appropriate. We have frequently so indicated with respect to numerous statutes. *See, e.g., Town of Johnston v. Santilli,* 892 A.2d 123, 133 (R.I. 2006) ("We recognize that there exists a public policy argument that in the current environment, school committees should have their own legal counsel. That debate, however, should be resolved in the public forum or in the Legislature, not in the courts."); *Moretti v. Division of Intoxicating Beverages,* 62 R.I. 281, 286, 5 A.2d 288, 290 (1939) ("If the matter is called to the attention of the [L]egislature it may be persuaded to make the necessary amendment to the statute* * *."); *see also Comtronics, Inc. v. Puerto Rico Telephone Co.,* 553 F.2d 701, 707 (1st Cir.1977) ("It is for Congress, * * * and not for this Court, to rewrite the statute to reflect changed circumstances."); *Cardi Corp. v. City of Warwick,* 122 R.I. 478, 479, 409 A.2d 136, 137 (1979); *Malinou v. Board of Elections,* 108 R.I. 20, 35, 271 A.2d 798, 805 (1970). As we said years ago with respect to another statute, " 'the court is to go no faster and no farther than the Legislature has gone.' " *State v. Goldberg,* 61 R.I. 461, 468, 1 A.2d 101, 104 (1938) (quoting *Howard v. Howard,* 120 Me. 479, 115 A. 259, 260 (1921)); *see also Rhode Island Dairy Queen, Inc. v. Burke,* 101 R.I. 644, 647, 226 A.2d 420, 422 (1967).

**A Final Consideration**

We know that sometimes our decisions result in palpable hardship to the persons affected by them. It is, however, a fundamental principle of jurisprudence that a court has no power to grant relief in the absence of jurisdiction, as is true in the instant case. Ours is not a policy-making branch of the government. We are cognizant of the fact that this observation may

be cold comfort to the parties before us. But, if there is to be a remedy to this predicament, fashioning such a remedy would fall within the province of the General Assembly.

## Conclusion

██ We conclude that the word "marriage" in § 8–10–3(a), the statute which empowers the Family Court "to hear and determine all petitions for divorce from the bond of marriage," was not intended by the General Assembly to empower the Family Court to hear and determine petitions for divorce involving (in the words of the certified question) "two persons of the same sex who were purportedly married in another state." *See Rhode Island State Labor Relations Board v. Valley Falls Fire District*, 505 A.2d 1170, 1171 (R.I. 1986) ("This [C]ourt has stated repeatedly that in construing a statute, our task is to establish and effectuate the intent of the Legislature by examining the language, nature, and object of the statute."). It necessarily follows that the Family Court, a court of limited statutory jurisdiction, is without jurisdiction over the captioned matter. *See generally Kenney*, 523 A.2d at 854–55.

For the reasons set forth in this opinion, the question certified by the Family Court must be answered in the negative.

The papers in this case, with our answer in the negative to the certified question endorsed thereon, are remanded to the Family Court for further proceedings.

SUTTELL, J., with whom GOLDBERG, J., joins, dissenting.

Because we firmly believe that our statutory law does not bar the doors of the

Family Court to Rhode Island citizens desiring a judicial determination of their marital status, we respectfully dissent.

We are in complete agreement with the majority on one critical point, however. The legal recognition that ought to be afforded same-sex marriages for any particular purpose is fundamentally a question of public policy, more appropriately determined by the General Assembly after full and robust public debate. If the courts are called upon to resolve any issue involving the validity of such a marriage, they must, of course, do so, but only when presented with an actual controversy by parties having adverse interests. *See Devane v. Devane*, 581 A.2d 264, 265 (R.I. 1990) ("courts exist for the purpose of deciding live disputes involving 'flesh and blood' legal problems with data 'relevant and adequate to an informed judgment' ") (quoting *People v. Lybarger*, 700 P.2d 910, 915 (Colo.1985)). Such is not the situation with the case at bar. Neither one of the parties is contesting the legal validity of the marriage performed in the Commonwealth of Massachusetts. Both plaintiff and defendant have filed a complaint and counterclaim, respectively, seeking to terminate that relationship in the Rhode Island Family Court. Both parties have satisfied the applicable domicile and residence requirements,[19] and they have filed a certified marriage certificate from a sister sovereign state attesting to the existence of their marriage. We believe that is sufficient to invoke the authority of the Family Court to entertain their divorce petitions.

At the outset we think it essential to note that the certified question presented to this Court is extremely narrow in

---

**19.** General Laws 1956 § 15–5–12(a) requires that at least one party "has been a domiciled inhabitant of this state and has resided in this state for a period of one year next before the filing of the complaint."

scope.[20] It requires only that this Court consider whether the Family Court may recognize a same-sex marriage for the limited purpose of entertaining a divorce petition. Thus, the question of whether such a marriage is entitled to recognition in Rhode Island for any other purpose is one this Court need not and should not answer. Clearly, the certified question does not implicate the eligibility *vel non* of same-sex couples to marry under Rhode Island marriage licensing laws.

The issue presented to this Court by the certified question is by its very terms limited to the divorce context. To answer the question, the dissenting justices perceive no need to consult forty-six-year-old editions of standard dictionaries. A brief survey of current dictionaries reveals that the same definition of the word "marriage" predominates today as it did when the Family Court Act[21] was enacted in 1961.[22] Nevertheless, the majority, in our opinion, overlooks the one central and unassailable fact upon which the certified question is predicated. On May 26, 2004, Ms. Chambers and Ms. Ormiston (the parties) were lawfully married under the laws of the Commonwealth of Massachusetts.

As we discuss below, the Family Court has been granted authority to hear and decide their complaint and counterclaim for divorce whether or not their marriage is determined to be legally valid in Rhode Island. We would answer the certified question in the affirmative, therefore, based on the plain language of the statutory grant of jurisdiction to the Family Court. In addition, we believe such jurisdiction to be consistent with Rhode Island's domestic relations jurisprudence in 1961, when the Family Court Act was enacted, as it is today.

### The Parties' Marriage

The parties, both of whom were domiciled inhabitants of Rhode Island, were married in a ceremony that took place on May 26, 2004, in Fall River, Massachusetts. Civil marriages between two persons of the same sex were authorized in the Commonwealth of Massachusetts by the decision of the Massachusetts Supreme Judicial Court in *Goodridge v. Department of Public Health*, 440 Mass. 309, 798 N.E.2d 941 (2003). In June 2004, thirteen municipal clerks and eight nonresident same-sex couples from several states, including Rhode Island, challenged the application and enforcement of Mass. Gen. Laws Ann. ch. 207, §§ 11 and 12.[23] *Cote–*

---

**20.** The certified question asks: "May the Family Court properly recognize, for the purpose of entertaining a divorce petition, the marriage of two persons of the same sex who were purportedly married in another state?"

**21.** General Laws 1956 chapter 10 of title 8.

**22.** The New Oxford American Dictionary 1039 (2d ed. 2005) ("the formal union of a man and a woman, typically recognized by law, by which they become husband and wife"); Black's Law Dictionary 992 (8th ed. 2004) ("The legal union of a couple as husband and wife."); Random House Webster's College Dictionary 757 (2d rev. ed. 2001) ("the social institution under which a man and woman live as husband and wife by legal or religious commitments"); Funk & Wag-

nalls Standard College Dictionary 829 (1963) ("a legal contract, entered into by a man and a woman, to live together as husband and wife"); The American College Dictionary 746 (1955) ("the legal union of a man with a woman for life").

**23.** Massachusetts General Laws Annotated ch. 207, §§ 11 and 12 lay out the procedure to be used when the applicants for marriage licenses are nonresidents. Section 11 provides that "[n]o marriage shall be contracted in this commonwealth by a party residing and intending to continue to reside in another jurisdiction if such marriage would be void if contracted in such other jurisdiction, and every marriage contracted in this commonwealth in violation hereof shall be null and

*Whitacre v. Department of Public Health,* 446 Mass. 350, 844 N.E.2d 623, 631 (2006) (Spina, J., concurring). Before issuing marriage licenses to same-sex couples in accordance with *Goodridge,* the Department of Public Health and the Registry of Vital Records and Statistics had issued forms and guidance that effectively interpreted Mass. Gen. Laws Ann. ch. 207, § 11 to bar municipal clerks from issuing marriage licenses to nonresident, same-sex couples. *See Cote–Whitacre v. Department of Public Health,* 18 Mass.L.Rptr. 190, 2004 WL 2075557, at *4 (Mass.Super.Aug. 18, 2004). As a result, the petitioning couples either had been denied marriage licenses or they had been prevented from having their marriages registered in the Commonwealth. *Cote–Whitacre v. Department of Public Health,* 2006 WL 3208758, at *1, 2006 Lexis 670, at *2 (Mass.Super.Sept.29, 2006). The Massachusetts Superior Court denied petitioners' motion to enjoin enforcement of Mass. Gen. Laws Ann. ch. 207, § 11 for failing to demonstrate a likelihood of prevailing on the merits. *Cote–Whitacre,* 2004 WL 2075557, at *6. On appeal, the Supreme Judicial Court, by plurality opinion, ruled that same-sex residents of certain states could not marry in Massachusetts but remanded concerning couples residing in New York and Rhode Island "for a determination whether same-sex marriage is prohibited in those States." *Cote–Whitacre,* 844 N.E.2d at 631.

On remand, a justice of the Massachusetts Superior Court applied the test pronounced by Chief Justice Marshall in her concurring opinion in *Cote–Whitacre* because, he said, it "articulates the narrowest grounds for the judgment of the court." *Cote–Whitacre,* 2006 WL 3208758, at *3,

2006 Lexis 670, at *8. Under that test, Rhode Island same-sex couples would be permitted to marry in Massachusetts unless the Massachusetts Superior Court determined that same-sex marriage is explicitly deemed void or otherwise expressly forbidden by a Rhode Island "constitutional amendment, statute, or controlling appellate decision." *Cote–Whitacre,* 844 N.E.2d at 653 (Marshall, C.J., concurring). Employing that construction of Mass. Gen. Laws. Ann. ch. 207, §§ 11 and 12, and finding no "prohibitory positive law" in Rhode Island, the trial justice ordered "that a declaratory judgment enter that same-sex marriage * * * is not prohibited in Rhode Island." *Cote–Whitacre,* 2006 WL 3208758, at *5, 2006 Lexis 670, at *15. The judgment was not appealed.

Whether the Massachusetts courts have correctly interpreted Rhode Island law is irrelevant to our analysis. What is germane is the fact the parties are married validly under Massachusetts law, as declared and applied by the Massachusetts courts. *See Cote–Whitacre,* 2006 WL 3208758, at *5, 2006 Lexis 670, at *15. That fact alone should end this Court's inquiry.

### Family Court Jurisdiction

The Family Court is a statutory court and is vested with jurisdiction "to hear and determine all petitions for divorce from the bond of marriage and from bed and board." G.L. 1956 § 8–10–3(a). Without question, Ms. Chambers and Ms. Ormiston are in, subject to, and/or entitled to the benefits of the bond of marriage, at least in the Commonwealth of Massachusetts, as well as any other jurisdiction that recognizes their marriage. They now wish to

---

void." Section 12 continues that [b]efore issuing a license to marry a person who resides and intends to continue to reside in another state, the officer having authority to issue the

license shall satisfy himself, by requiring affidavits or otherwise, that such person is not prohibited from intermarrying by the laws of the jurisdiction where he or she resides.

dissolve that bond and return to the status of single persons. Unless one or both of them establish the domicile and residency requirements of another jurisdiction, however, the Rhode Island Family Court is the only forum available to them to terminate their marriage. Moreover, because the parties are citizens of Rhode Island it is solely within the sovereign authority of Rhode Island to determine and/or alter their marital status by granting or denying their divorce complaint and counterclaim. That, in our opinion, is precisely the relief available to them under the plain and ordinary language of § 8–10–3.

This Court has long recognized that marriage is a contractual relationship between the parties to it, profoundly affecting their status, *i.e.*, their legal and social condition, and that the state has the sovereign authority to fix or alter the status of its domiciled citizens. In 1856, this Court said:

"[I]t is obvious, that marriage, as a domestic relation, emerged from the contract which created it, is known and recognized as such throughout the civilized world; that it gives rights, and imposes duties and restrictions upon the parties to it, affecting their social and moral condition, of the measure of which every civilized state, and certainly every state of this Union, is the sole judge so far as its own citizens or subjects are concerned, and should be so deemed by other civilized, and especially sister, states; that a state cannot be deprived, directly or indirectly, of its sovereign power to regulate the *status* of its *own* domiciled subjects and citizens, by the fact that the subjects and citizens, of other states, as related to them, are interested in that *status*, and in such a matter has a right, under the general law, judicially to deal with and modify or dissolve this relation, binding both parties to it by the decree, by virtue of its

inherent power over its own citizens and subjects, and to enable it to answer their obligatory demands for justice * * *." *Ditson v. Ditson*, 4 R.I. 87, 105–06. (1856).

In 1904, this Court pronounced, "It is a matter of duty which the courts owe to the public to declare the situation of the parties. * * * It may be necessary, for the convenience and happiness of families, and of the public, likewise, that the real character of these domestic connections should be ascertained and made known." *Leckney v. Leckney*, 26 R.I. 441, 445, 59 A. 311, 312 (1904) (quoting *Lea v. Lea*, 104 N.C. 603, 10 S.E. 488, 489 (1889)).

If a statute is unambiguous, "there is no room for statutory construction and [the Court] must apply the statute as written." *State v. Day*, 911 A.2d 1042, 1045 (R.I. 2006) (quoting *State v. DiCicco*, 707 A.2d 251, 253 (R.I.1998)). "If the [statutory] language is clear on its face, then the plain meaning of the statute must be given effect and this Court should not look elsewhere to discern the legislative intent." *Henderson v. Henderson*, 818 A.2d 669, 673 (R.I.2003) (quoting *Fleet National Bank v. Clark*, 714 A.2d 1172, 1177 (R.I. 1998)). In this case, it cannot be gainsaid that the parties are married for all legal purposes under the laws of the Commonwealth of Massachusetts. We, the dissenting justices, discern no impediment in the language of § 8–10–3 that precludes the Family Court from entertaining their petition for divorce from the bond of their Massachusetts marriage. The subject-matter jurisdiction of the Family Court does not turn on the gender of the parties; rather it turns on their status as a married couple.

### The Family Court Act

Although we are satisfied that the plain meaning of § 8–10–3(a) is sufficient to de-

termine that appropriate authority resides in the Family Court to entertain the parties' complaint and counterclaim, we also find support for such authority outside the statutory language. The fact that the commonly accepted meaning of the word "marriage" in 1961, the year the Family Court Act was enacted, referred to a union between a man and a woman does not alter the analysis.[24] It would have been quite extraordinary indeed if the original drafters of the act had anticipated or even contemplated same-sex marriages. Such a concept would have been as foreign to the General Assembly in 1961 as would have been the advent of the Internet to the drafters of the "commerce clause" in the United States Constitution.[25] *See Simmons v. State,* 944 So.2d 317, 331 (Fla. 2006) ("the Internet 'represents an instrument of interstate commerce, albeit an innovative one'") (quoting *American Libraries Association v. Pataki,* 969 F.Supp. 160, 173 (S.D.N.Y.1997)). Nevertheless, "[i]n attempting to apply a statute to a situation that was not intended by its drafters, the interpreting court should not rely on literalisms, technical constructions, or so-called formal rules of interpretation, but rather should rely on the breadth of objectives of the legislation and the common sense of the situation."[26] A brief examination of the context of § 8–10–3 clearly demon-strates that the Family Court possesses the authority to hear the parties' divorce.

The General Assembly created the Family Court in 1961 and infused it with broad and exclusive jurisdiction over all matters of domestic relations. *Opinion to the Governor,* 93 R.I. 211, 213, 172 A.2d 596, 597 (1961) ("the [L]egislature intended to divest the [S]uperior [C]ourt of all existing jurisdiction over divorces and all matters of domestic relations generally and to vest that jurisdiction exclusively in the [F]amily [C]ourt on and after September 1, 1961"). We first observe that § 8–10–2 expressly provides that the Family Court Act "shall be liberally construed to the end that families whose unity or well-being is threatened shall be assisted and protected, and restored, if possible, as secure units of law-abiding members * * *." Surely that language encompasses a family whose well-being is best served by severing its legal relationship. *See Von Schack v. Von Schack,* 893 A.2d 1004, 1011 (Me.2006) ("Maine has a unique interest in assuring that its citizens are not compelled to remain in such personal relationships against their wills * * *.").

**Void or Voidable Marriages**

More significant, however, is the well-recognized principle of statutory construction that the Legislature is presumed to

---

**24.** The majority opinion rests on the definition of the word "marriage" as gleaned from dictionaries circa 1961. The Court states, "there is absolutely no reason to believe that when the Act creating the Family Court became law in 1961, the legislators understood the word marriage to refer to any state other than 'the state of being united to a person of the opposite sex,'" and cites several dictionaries signifying that marriage is a contract or union between a man and a woman. Yet G.L. 1956 § 15–1–5, originally enacted in 1896 (G.L. 1896, ch. 191, § 5), declares bigamous marriages void. Arguably the General Assembly in 1961 understood a marriage, albeit a void marriage, to encompass something other than the strict dictionary definition of one man, one woman. It is perhaps also interesting to note that since Congress enacted the Defense of Marriage Act, 28 U.S.C. § 1738C, in 1996, thirty-eight states, not including Rhode Island, have deemed it desirable to statutorily define marriage as a union between one man and one woman, or otherwise expressly prohibit same-sex marriages.

**25.** United States Constitution Art. I, § 8.

**26.** 2A Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutory Construction* § 46:2 at 161–62 (7th ed. 2007).

know the state of existing relevant law when it enacts or amends a statute. *State v. Sivo,* 925 A.2d 901, 916–17 (R.I.2007); *Barrett v. Barrett,* 894 A.2d 891, 898 (R.I. 2006); *Shelter Harbor Fire District v. Vacca,* 835 A.2d 446, 449 (R.I.2003). Two important aspects of the law as it existed in 1961 are persuasive evidence that the reach of § 8–10–3's grant of jurisdiction to the Family Court includes the power to adjudicate divorces from same-sex marriages.

First, when § 8–10–3 was enacted in 1961, the divorce laws contained a curious catchall provision: "Divorces from the bond of marriage shall be decreed in case of any marriage originally void or voidable by law * * *." G.L. 1956 § 15–5–1. That section, unamended, remains vital today. Thus, the Family Court's authority to entertain a divorce petition does not depend on the validity of the marriage itself. A void marriage is a nullity, one that is invalid from its inception. *See* Black's Law Dictionary 994–95, 1098 (8th ed. 2004). It is evident, therefore, that the General Assembly has provided a means of relief in the Family Court to parties who have entered a marriage that could neither be performed in Rhode Island nor granted legal effect in the state. It is incongruous to hold that a Rhode Island resident who lawfully has entered into a same-sex marriage is afforded no means to dissolve the union in Rhode Island, whereas a Rhode Island resident who may have entered into an incestuous or bigamous marriage, both of which are statutorily void, is entitled to divorce under § 15–5–1.

The scope of the certified question under review does not permit this Court to consider the underlying validity of the parties' marriage. It is sufficient for our in-quiry to acknowledge the authority of the Family Court to grant (or deny) a divorce complaint on the grounds, when properly pled, of voidness or voidability under § 15–5–1, as it might grant a complaint on one of the other enumerated grounds such as irreconcilable differences,[27] living separate and apart for at least three years,[28] or extreme cruelty.[29]

### Principles of Comity

Secondly, the well-settled rule of law in 1961 was, and still remains, that the validity of a marriage is determined by the law of the place where celebrated. *Ex parte Chace,* 26 R.I. 351, 354, 58 A. 978, 979 (1904). The United States Supreme Court has said "[m]arriages not polygamous or incestuous, or otherwise declared void by statute, will, if valid by the law of the State where entered into, be recognized as valid in every other jurisdiction." *Loughran v. Loughran,* 292 U.S. 216, 223, 54 S.Ct. 684, 78 L.Ed. 1219 (1934). This rule of common law, *lex loci celebrationis,* is based upon the general principle "that the capacity or incapacity to marry depends on the law of the place where the marriage is celebrated, and not on that of the domicile of the parties." *Ex parte Chace,* 26 R.I. at 354, 58 A. at 979. " '[A]ll nations have consented, or must be presumed to consent, for the common benefit and advantage, that * * * marriages should be good, or not according to the laws of the country where they are made. * * * By observing this law no inconvenience can arise, but infinite mischief will ensue if it is not.' " *Id.* at 355, 58 A. at 980 (quoting *Scrimshire v. Scrimshire,* 2 Hagg. Cons. 395, 417). This doctrine reflects the principle of comity, or "[t]he recognition and respect that a court of one state * * * shows to

---

**27.** G.L. 1956 § 15–5–3.1(a).

**28.** Section 15–5–3(a).

**29.** Section 15–5–2(3).

another state * * * in giving effect to the other's laws and political decisions." Black's Law Dictionary 863 (8th ed. 2004). "Comity is not a positive rule of law but one of practicality based on a proper regard for the law of a foreign state." *O'Brien v. Costello*, 100 R.I. 422, 430, 216 A.2d 694, 699 (1966). Because the doctrine was settled law in 1961, the General Assembly that originally enacted § 8–10–3 conferring jurisdiction on the Family Court "to hear and determine all petitions for divorce from the bond of marriage" is charged with the knowledge that the capacity of Rhode Island citizens to marry might well be determined by some other jurisdiction.

The *Chace* Court also noted the well-recognized exception to this general rule, *viz.*, when "a marriage is odious by the common consent of nations, or if its influence is thought dangerous to the fabric of society, so that it is strongly against the public policy of the jurisdiction * * *." *Ex parte Chace*, 26 R.I. at 356, 58 A. at 980. As we previously have noted, however, even if the presumption of validity of a Massachusetts same-sex marriage were rebutted by a showing that it was "strongly against the public policy" of Rhode Island, or if the General Assembly declared it as such, the Family Court would not be deprived of authority to entertain a petition seeking to dissolve the marriage. *See* § 15–5–1.

When construing a statute, this Court's "ultimate goal is to give effect to the purpose of the act as intended by the Legislature." *Hanley v. State*, 837 A.2d 707, 711 (R.I.2003) (quoting *Oliveira v. Lombardi*, 794 A.2d 453, 457 (R.I.2002)). We believe that, with respect to the certified question, the legislative intent underlying § 8–10–3 is self-evident from its language vesting the Family Court with jurisdiction "to hear and determine all petitions for divorce from the bond of marriage." We also believe that the purpose of the statute's grant of jurisdiction to the Family Court is clear when it is viewed in the larger context of Rhode Island's domestic relations jurisprudence at the time the Family Court Act was enacted. That purpose is to give all Rhode Island citizens a means of determining their marital status and dissolving their marriage.

Finally, we observe that "we are bound to construe a statute in the most beneficial way which its language will permit, in order to prevent inconsistency or injustice." *State v. Drowne*, 20 R.I. 302, 306, 38 A. 978, 979 (1897). The result of the majority's opinion, in our view, places the parties, and all those similarly situated, in an untenable position. They are denied access to the Family Court and thus are left in a virtual legal limbo, unable to extricate themselves from a legal relationship they no longer find congenial without establishing the domicile and residency requirements of some other jurisdiction. Such a result runs afoul of the " 'matter of duty which the courts owe to the public to declare the situation of the parties,' " *Leckney*, 26 R.I. at 445, 59 A. at 312, and, in our opinion, is not required by the language of § 8–10–3. By leaving same-sex marriage outside the purview of the Family Court, indeed outside the definition of the word "marriage" itself, the parties have no means of dissolving the marriage they entered into in Massachusetts, and thereby no means of altering their marital status in their domiciliary state.

We also are mindful that same-sex relationships are gradually gaining legal recognition, and domestic partners are afforded many of the same protections heretofore available only to opposite-sex couples. This Court has held that "it is not illegal for two men to live together, much less to contract and to enter into

partnerships with each other while doing so." *Doe v. Burkland*, 808 A.2d 1090, 1094 (R.I.2002). In *Rubano v. DiCenzo*, 759 A.2d 959 (R.I.2000), we declared jurisdiction in the Family Court, under the Uniform Law on Paternity no less, to determine the existence *vel non* of a de facto parent-child relationship between a woman and the biological child of her former same-sex domestic partner. Moreover, the General Assembly has extended various benefits to same-sex couples. For instance, the term "dependents" is defined to include "domestic partners" in a statute extending certain insurance benefits to dependents of state employees. G.L. 1956 § 36–12–1(3). In 2006, the General Assembly enacted legislation providing that for the purposes of fulfilling an employer's obligations under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), a domestic partner is a dependent of an employee. Section 36–12–2.4, as enacted by P.L. 2006, ch. 189, § 2. Also in 2006, the General Assembly extended the state Parental and Family Medical Leave Act to domestic partners. G.L. 1956 § 45–19–4.3.

In summary, we believe § 8–10–3 confers authority on the Family Court to entertain a petition seeking to dissolve a same-sex marriage. In our view, the filing of a complaint and a certified marriage certificate is sufficient to invoke such authority; it is enough to get one in the door of the Family Court, which, we believe, the General Assembly intended to be a comprehensive forum for resolving issues concerning marital relations.

We would answer the certified question therefore in the affirmative. Such an answer in our opinion not only is compelled by the plain and ordinary meaning of the statutory language, but also is consistent with the policies and purposes of the Family Court Act by providing Rhode Island citizens a means of dissolving their marriage and judicially determining their marital status. In addition, we believe it to be consistent with the expectations of those Rhode Island residents who have in good faith entered into same-sex marriages in Massachusetts. We do not mean to suggest, however, that the Family Court is precluded from adjudicating the validity of the marriage if one of the parties alleges the marriage is void or voidable. We agree rather with the Governor, the Attorney General and several other amici curiae [30] that this Court should answer the certified question in the affirmative without determining the legal validity of the underlying marriage. The parties in this case have not challenged the marriage, and therefore the issue of voidness is not properly before the Court. Moreover, we do not think it proper for the Court, on the state of this record, to attempt to determine whether same-sex marriage is "strongly against the public policy of this jurisdiction." *See Ex parte Chace*, 26 R.I. at 356, 58 A. at 980. The resolution of that issue resides in the State House and not the courthouse. In the case at bar, therefore, we would remand to the Family Court for further proceedings on the plaintiff's complaint and the defendant's counterclaim.

---

**30.** We join the majority in expressing our appreciation to amici curiae for their thorough, sometimes creative, and very helpful briefs.