DECISION
Plaintiff, Rhode Island Brotherhood of Correctional Officers ("RIBCO" or "Union") seeks a declaratory judgment regarding the proper scope of Rhode Island General Laws § 28-9.7-1 etseq., the "Correction Officers Arbitrations Act" ("COAA"). Specifically at issue is the appropriate scope of the term "correctional officer" as used by the General Assembly in the COAA. RIBCO asks this Court to declare and adjudge that the members of bargaining units EE 3620 and EE 2003 fall within the definition of "correctional officers" under the COAA. Consequently, RIBCO seeks a declaration that the COAA applies to interest arbitration proceedings between the Defendant, State of Rhode Island, Department of Corrections (the "State") and all members of the aforementioned bargaining units. RIBCO also seeks other such relief including attorneys' fees and costs, as this Court deems appropriate. For the reasons contained herein, this Court denies RIBCO's motion for declaratory judgment. Jurisdiction is pursuant to G.L. 1956 § 9-30-1 et seq.
 I FACTS AND TRAVEL
In September 1971, the Rhode Island State Labor Relations Board (the "Labor Relations Board") certified RIBCO as the collective bargaining representative of Unit EE 1973 comprised *Page 2 
of correctional officer supervisory personnel. That unit later became part of Unit EE 3620. Later in March 1972, the Labor Relations Board also certified RIBCO as the collective bargaining representative of Unit 2003, comprised mainly of rank and file correctional officers. Since 1972, both units have been bound by the same Collective Bargaining Agreement ("CBA"). In June 1996, the then-existing CBA between RIBCO and the State expired. Following the expiration of the 1996 CBA, the two parties began negotiations for a successor agreement (the "2000-2003 CBA"). Negotiations reached a standstill, and the two parties submitted the dispute to a mediator. Mediations also failed to produce an agreement between the two parties. The parties then proceeded to interest arbitration under the provisions of the then-applicable State Employees Arbitrations Act ("SEAA"), G.L. 1956 § 36-11-1 et seq. Arbitrator William Croasdale was assigned to the interest arbitrations between the two parties. In June 2000, the Arbitrator recommended that all RIBCO members be given a retroactive pay raise of thirteen percent for the period of 1996-2000. However, under the provisions of the SEAA, the award given by the Arbitrator was not binding regarding the issue of wages. Following the close of the interest arbitrations, the State instituted a pay raise that was only a portion of the Arbitrator's recommended amount.
On July 26, 2000, as a result of the State's partial compliance with the Arbitrator's recommendation, RIBCO members participated in a work stoppage and refused to report to work. As a result, the State Police and National Guard were called in to maintain order, and the Adult Correctional Institution in Cranston was locked down. RIBCO's work stoppage lasted one day. A Rhode Island Superior Court trial justice ordered RIBCO members back to work. This order extended to both correctional officers and all civilians working for the State. Additionally, the trial justice ordered the State and RIBCO to return to negotiations. Specifically, the trial *Page 3 
justice ordered the two parties to resolve the pay dispute arising from the 1996-2000 award issued by the Arbitrator. The trial justice also ordered the State and RIBCO to return to negotiations for the terms of a 2000-2003 CBA. Following these mediations, the State agreed to pay the retroactive wages, and the 2000-2003 CBA was finalized. Final payment of the recommended retroactive wage increase was made in July 2004.
In May 2003, negotiations began on a successor to the 2000-2003 CBA (the "2003-2006 CBA"). After eight meetings, the parties suspended negotiations in September 2003. Amidst these negotiations for the 2003-2006 CBA, on June 30, 2004, the General Assembly enacted the COAA. The COAA replaced the advisory arbitration provisions of the SEAA with binding arbitration provisions on all matters (including those regarding wages). In September 2005, RIBCO and the State restarted negotiations for the 2003-2006 CBA. During these negotiations, an issue immediately arose between the parties as to whether the COAA applied to the current round of negotiations. RIBCO filed a declaratory judgment action in Rhode Island Superior Court to resolve this dispute. In December of 2006, a Superior Court justice issued a bench decision finding that the COAA applied to contract disputes between RIBCO and the State from 2003 forward. The final version of the order executed by the Court provided: "The Correctional Officers' Arbitration Act, G.L. 1956 § 28-9.7-1 et seq., applies to contract negotiations between the parties. [RIBCO and the State] Accordingly, the parties may invoke the procedures under the Act."
Following that court order, on March 12, 2007, the parties engaged in interest arbitration proceedings before a three-member Panel of Arbitrators. The applicability of the COAA and the Arbitration Panel's jurisdiction were discussed between the two parties at the interest arbitration meetings. The State took the position that under the language of the COAA, the jurisdiction of *Page 4 
the Arbitration Panel was limited to deciding unresolved issues relating only to correctional officers, and that the COAA did not extend to civilian members of RIBCO's bargaining units. RIBCO, however, argued that the COAA applied to both the correctional officers and civilian members of Bargaining Units EE 3620 and EE 2003.
During the course of the arbitrations, the parties agreed that a number of RIBCO members could be properly classified as "correctional officers" as defined by the COAA. Additionally, both parties agreed that a number of RIBCO's members could be properly classified as civilians. However, the two parties could not reach an agreement regarding proper classifications for a number of RIBCO's members. Although the two parties agreed that a number of individual members of RIBCO's bargaining units could not be classified as "correctional officers," RIBCO maintained that the COAA should be extended to all civilian members of the bargaining units.
Following these proceedings, the Panel of Arbitrators concluded that any job classification with primary duties of custody and control would be classified as a "correctional officer" and, therefore, covered by the COAA. The Arbitrators also concluded that civilian job classifications would not be classified as "correctional officers." Any classification that was disputed between the two parties was also deemed to be a "correctional officer" for purposes of the COAA. On June 30, 2008, the Arbitrators issued their award. Thereafter, on July 28, 2008, RIBCO filed the instant action pursuant to § 9-30-1, seeking declaratory relief. RIBCO is arguing, in effect, that interest arbitration proceedings between the State and RIBCO are governed by the COAA for all members of Bargaining Units EE 3620 and EE 2003. *Page 5 
 II STANDARD OF REVIEW
Rhode Island General Laws § 9-30-1 defines the scope of the Uniform Declaratory Judgments Act including the scope of this Court's jurisdiction. Section 9-30-1 states:
 "The superior or family court upon petition, following such procedure as the court by general or special rules may prescribe, shall have the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect; and such declarations shall have the force and effect of a final judgment or decree."
"A declaratory-judgment action may not be used `for the determination of abstract questions or the rendering of advisory opinions.'" Sullivan v. Chafee, 703 A.2d 748, 751 (R.I. 1997) (quoting Lamb v. Perry,101 R.I. 538, 542, 225 A.2d 521, 523 (1967)). Section 9-30-2 enumerates what parties may, in fact, bring a declaratory judgment action, and § 9-30-12 governs construction of the Uniform Declaratory Judgments Act and holds that it is to be "liberally construed and administered." See Berberian v. Travisono,114 R.I. 269, 332 A.2d 121 (1975). Also, "the existence of alternate methods of relief does not preclude a party from relief under the Uniform Declaratory Judgments Act." Id. Factors to be considered in determining whether or not to grant declaratory relief include "the existence of another remedy, the availability of other relief, the fact that a question may readily be presented in an actual trial. . . ." Id. The Court has considerable discretion as to whether to grant or deny a request for declaratory judgment.Town of Barrington v. Williams,972 A.2d 603, 608 (R.I. 2009). While the Court has the authority to issue declaratory judgments, it has no duty to do so. Cruz v.Wausau Insurance, 866 A.2d 1237, 1240 (R.I. 2005). *Page 6 
 III ANALYSIS
In the instant case, RIBCO alleges that the State seeks to divide the members of its bargaining units based on their classifications and then have them participate in different arbitrations for the terms and conditions of the same CBA. Specifically, RIBCO asserts that the State's interpretation of the COAA frustrates legislative intent. Further, RIBCO posits that the State's interpretation of the relevant statutory language is an error of law. The two parties propound conflicting interpretations of the language of the COAA. The State interprets the language of the COAA to apply only to correctional officers. RIBCO, however, interprets the COAA to apply to all members of Bargaining Units EE 3620 and EE 2003, which are comprised mainly of sworn correctional officers, but also include a number of civilian positions as described in the succeeding paragraphs.
The lynchpin of RIBCO's argument is that the General Assembly intended for the COAA to govern the resolution of a CBA for all members of RIBCO's bargaining units. In RIBCO's view, the ambiguous language of the COAA is an implicit acknowledgement that the COAA applies to members of the bargaining units. Furthermore, RIBCO notes that the State's view that COAA applies only to a certain part of the RIBCO bargaining units would create an unnecessary conflict with the State Labor Relations Act (the "SLRA"). RIBCO emphasizes that the General Assembly was presumed to be aware of labor problems between RIBCO and the State when drafting the COAA, and that mixed bargaining units were commonly accepted by the Labor Relations Board when the COAA was enacted. As such, RIBCO argues that the Legislature clearly envisioned the COAA to apply to all members of the collective bargaining units that are *Page 7 
comprised mainly of correctional officers. Lastly, RIBCO observes that the State's attempt to define "correctional officer" is in no way connected with either the COAA or the SLRA.
The State, reading the COAA as a whole, adopts a narrower interpretation of the relevant statutory language. The State purports that the COAA applies only to correctional officers and cannot be applied to other members of RIBCO's bargaining units. The State asserts that the plain meaning of the term correctional officer should be used when reading the COAA. Furthermore, the State cites to statutes with similar language in order to demonstrate the Legislature's intent to have the COAA apply only to correctional officers. The State asks this Court to observe the nature of the COAA in order to glean the proper scope of the relevant statutory language. The State, reading the COAA language as a whole, argues that the following job positions are not "correctional officers" as defined by § 28-9.7-1[1]: Assistant Chief Distribution Officer, Automobile Service Shop Supervisor (Corrections), Business Management Officer, Chief of Motor Pool Maintenance, Clerk Secretary, Correctional Investigator I, Correctional Investigator II, Correctional Officer Hospital, Correctional Officer Hospital II, Correctional Officer Hospital Supervisor, Counseling Services Coordinator (Corrections), Data Control Clerk, Dental Assistant (Corrections), Fiscal Management Officer, Furniture/Upholstery Repair Shop Supervisor, Garment Shop Supervisor (ACI), Horticulture Shop Supervisor (ACI), Industries General Supervisor (ACI), Information Aid, Janitorial/Maintenance Supervisor (Corrections), Librarian (ACI), Maintenance Superintendent (Corrections), Marketing-Sale Manager (Prison Industries), Medical Records Clerical Supervisor, Medical Records Clerk, Metal Stamping Shop Supervisor (ACI), Motor Equipment Operator (ACI), Office Manager, *Page 8 
Pharmacy Aide, Printing Shop Supervisor (Corrections), Supervisor of Correctional Officer Training, Security Specialist (Corrections), Senior Accountant, Senior Clerk, Senior Reconciliation Clerk, Senior Teller, Senior Word Processing Typist, Senior X-Ray Technician Corrections, Storekeeper (ACI), Supervising Pre-Audit Clerk, Supervisor Central Mail Services Supervisor, Supervisor of Food Services (Corrections), Work Rehabilitation Program Supervisor, Accountant, Assistant Administrative Officer, Assistant Administrator Financial Management, Assistant Business Management Officer, Assistant Supervising Data Entry Operator, Auto Body Shop Supervisor (ACI), Bookkeeping Machine Operator, Chief Medical Records Librarian, Clerk Typist, Community Correctional Specialist I, Community Correctional Specialist II, Correctional Specialist I, Correctional Specialist II, Data Entry Operator, Data Entry Unit Supervisor, Federal Surplus Property Officer, Fiscal Clerk, Furlough Coordinator, Furlough Officer, Graphic Make-Ready Supervisor (ACI), Junior Electronic Computer Programmer, Laundry Manager, Paint Janitorial Supply Shop Supervisor (Corrections), Physician Extender, Principal Clerk Stenographer, Principal Clerk Typist, Principal Systems Analyst, Printer (ACI), Property Control Supply Officer (ACI), Psychometrist, Reconciliation Clerk, Recreation Leader (ACI), Screening Officer, Senior Clerk Stenographer, Senior Clerk Typist, Senior Electronic Computer Programmer, Sign Painter Supervisor (ACI), Teller, Warehouse Worker (Corrections), and Word Processing Typist.
 A The COAA
The Court shall examine the pertinent sections of the COAA at issue. The COAA provides that "the protection of the public health, safety and welfare demands that full-time correctional officers . . . not be accorded the right to strike or engage in any work stoppage or *Page 9 
slow down." Sec. 28-9.7-2(a). The COAA goes on to state that "it is hereby declared to be the public policy of this state to accord to the full-time correctional officers of this state all of the rights for labor other than the right to strike or engage in any work stoppage or slow down. To provide for the exercise of these rights, a method of arbitration of disputes is hereby established." Sec. 28-9.7-2(b). The method of arbitration established by the COAA is binding arbitration before a three-person panel selected by the parties. See § 28-9.7-9. Section 28-9.7-9(b) provides that a "majority decision of the arbitrators shall be binding upon both the bargaining agent and the state authorities."
Additionally, § 28.9.7-12 states that "any agreements actually negotiated between the bargaining agent and the state authorities either before or within thirty (30) days after arbitration shall constitute the collective bargaining contract governing correctional officers and the state for the period stated therein, provided that the period shall not exceed three (3) years." This section further notes that "any collective bargaining agreement negotiated under the terms and provisions of this chapter shall specifically provide that the correctional officers who are subject to its terms shall have no right to engage in any work stoppage, slowdown, or strike, the consideration for the provision being the right to a resolution of disputed questions." Therefore, by its terms, the COAA applies only to correctional officers. The COAA defines "correctional officer" in § 28-9.7-3(2) to be "a full-time correctional officer of the state of Rhode Island."
 B Plain Language of the COAA
The Rhode Island Supreme Court has made it clear that when interpreting a statute, if the language of a statute is clear and unambiguous, the Court must interpret the statute literally and must give the words of the statute their plain and ordinary meaning.State v. Santos, 870 A.2d 1029, 1032 (R.I. 2005). *Page 10 
The Court opined that "if a law is plain and within the legislative power, it declares itself, and nothing is left for interpretation . . . it is axiomatic that [the] Court will not broaden statutory provisions by judicial interpretation unless such interpretation is necessary and appropriate in carrying out the clear intent of defining the terms of the statute." Id. However, "when a statute is susceptible of more than one meaning, [the court must] employ [its] well-established maxims of statutory construction in an effort to glean the intent of the Legislature." Town ofBurriville v. Pascoag Apt. Assocs. LLC,950 A.2d 435, 445 (R.I. 2008) (citing Unistrut Corp. v. StateDep't of Labor Training, 922 A.2d 93, 98 (R.I. 2007)). The Court's "interpretation of an ambiguous statute is grounded in policy considerations and [it] will not apply a statute in a manner that will defeat its underlying purpose." Id. Furthermore, it has been stated "repeatedly that in construing a statute, [the court's] task is to establish and effectuate the intent of the Legislature by examining the language, nature and object of the statute. . . . Furthermore, th[e] court will not adopt a construction that effects an absurd result." Chambers v.Ormiston, 935 A.2d 965, 967 (R.I. 2008) (citing Rhode IslandState Labor Relations Bd. v. Valley Falls Fire District,505 A.2d 1170, 1171 (R.I. 1986)).
In so construing the COAA, the Court will adhere to the "fairest and most rational method" of interpreting laws as set forth by Sir William Blackstone in his Commentaries of 1758. In re Advisory tothe Governor (Judicial Nominating Comm'n),668 A.2d 1246, 1248-49 (R.I. 1996); 1 Sharswood's Blackstone's Commentaries, Laws of England 58 (1860). Blackstone described five "signs" that constitute "the most natural and probable guides to the will of a legislature:
 "[w]ords . . . understood in their usual and most known signification [and in] their general and popular use. . . . If words happen to be still dubious, we may establish their meaning from the context. . . . As to the subject matter, words are always to be understood as having a *Page 11 
regard thereto . . . [with] expressions directed to that end. . . . As to the effects and consequence, the rule is, that where words bear either none, or a very absurd signification, if literally understood, we must a little deviate from the received sense of them. . . . But, lastly, the most universal and effectual way of discovering the true meaning of a law . . . is by considering the reason and spirit of it." Commentaries, at 58-60; In re Advisory, 668 A.2d at 1249.
In the instant case, the plain language of the statute provides that the COAA applies only to "correctional officers." The language of the COAA is clear and unambiguous. The Rhode Island Supreme Court has seen fit to turn to the ordinary definition of a word to give words their plain and ordinary meaning. "It is a fundamental principle that in the absence of statutory definition or qualification the words of a statute are given their ordinary meaning. In carrying out the process of determining the meaning of words employed by an enacting legislature, reference to contemporaneous dictionaries is appropriate and often helpful."Chambers v. Ormiston, 935 A.2d 956, 962 (R.I. 2007). "We believe that the primary . . . definition normally expresses the ordinary meaning of the word being defined." See id.
In order to determine what constitutes a "correctional officer" as defined by the COAA, reference can be first made to the statute itself. The COAA defines a "correctional officer" in § 9.7-3(2) to be "a full-time correctional officer of the State of Rhode Island." Both the United States Department of LaborOccupation Outlook Handbook, 2008-2009 Edition[2] and the Rhode Island Office of Personnel Administration provide instructive job descriptions for a "full-time correctional officer." The Rhode Island Supreme Court has declared that it looks to federal labor law for guidance in resolving labor disputes. SeeDiGuilio v. R.I. Bhd. of Corr. Officers,819 A.2d 1271, 1273 (R.I. 2003). The job description for "correctional officer" provided by the U.S. *Page 12 
Department of Labor is certainly a helpful resource for this Court in determining the plain meaning of the term. The U.S. Department of Labor Handbook defines a correctional officer as
 "responsible for overseeing individuals who have been arrested and are awaiting trial or who have been convicted of a crime and sentenced to serve time in a jail, reformatory, or penitentiary. . . . Correctional officers maintain security and inmate accountability to prevent disturbances, assaults and escapes. . . . [C]orrectional officers maintain order within the institution and enforce rules and regulations. To help ensure that inmates are orderly and obey rules, correctional officers monitor the activities and supervise the work assignments of inmates. Sometimes, officers must search inmates and their living quarters for contraband like weapons and drugs, settle disputes between inmates, and enforce discipline. Correctional officers periodically inspect facilities, checking cells and other areas of the institution for unsanitary conditions, contraband, for hazards, and any evidence of infraction of the rules. In addition, they routinely inspect locks, windows, bars, grilles, doors and gates for signs of tampering. Finally, officers inspect mail and visitors for prohibited items." The Occupational Outlook Handbook, (March 18, 2011), http://www.bls.gov/ocs/ocos156.htm.
Additionally, the Rhode Island Division of Personnel Administration, whose responsibilities include making available to state agencies qualified candidates for employment pursuant to its authority under G.L. 1956 § 36-3-5(5), defines "correctional officer" within its job descriptions as one who is "responsible for safeguarding the custody and well-being of inmates confined in the State Correctional Institution; to supervise their conduct and to maintain order and discipline among them; to carry out plans for their training and rehabilitation; and to do related work as required." Illustrative examples of the work to be performed include:
 "Supervise the conduct of and to maintain order and discipline among inmates. Assist inmate on matters pertaining to their adjustment to institutional conditions and to assist them in personal, emotional, and adjustment problems or to direct them to the proper person for guidance. . . .Operate devices for locking and unlocking security doors, cells and close custody facilities and to be accountable for all keys used for these purposes. . . .Make regular inmate counts and to make reports thereon to a *Page 13 
superior officer. Carry firearms in the performance of outer perimeter security duty and emergency assignments. Maintain proficiency in the use, care and operation of firearms. Exercise constant vigilance to observe any unusual activities or movement of individuals or groups indicative of attempted escape and riot . . .Inspect inmate quarters to see that they are in sanitary and orderly condition." Rhode Island Department of Corrections, Correctional Officer Applicant Success Guide, (March 18, 2011), http://www.doc.ri.gov/documents/2009%20Correctional%20Offi
cer%20Success%20Guide.pdf
Correctional officers must also complete an eight-week correctional officer training program and must pass a medical and psychological exam.
Based on plain meaning of the term "correctional officer," as used by both the U.S. Department of Labor and the Rhode Island Division of Personnel Administration, clerk typists, accountants, data entry clerks, secretaries and other civilian employees clearly do not fall within the meaning of "full-time correctional officer" as defined in the COAA. In determining whether an individual is a "correctional officer," the primary duties of the employees in this classification must be addressed. These duties involve safeguarding the custody and well-being of the inmates, supervising their conduct and maintaining order and discipline among them, carrying out plans for their training and rehabilitation, or supervising employees who perform those tasks. Any employees who do not meet these criteria clearly fall outside the scope of the COAA. Although there are numerous civilian members of RIBCO's bargaining units, mere association with correctional officers does not make them correctional officers. *Page 14 
 C Established Canons of Statutory Construction 1 The Doctrine of "In Pari Materia"
Even if the words were ambiguous, established cannons of statutory construction resolve any possible ambiguity regarding the legislature's intent and accomplish the same result. "Statutes relating to the same subject matter should be considered together so that they will harmonize with each other and be consistent with their general objective scope." State v. Such,950 A.2d 1150, 1156 (R.I. 2008) (citing State ex rel. Webb v.Cianci, 591 A.2d 1193, 1203 (R.I. 1991)). "Such statutes are considered to be in pari materia which stands for the simple proposition that statutes on the same subject are to be read in relation to each other." Id.
Application of this doctrine illustrates a clear legislative intent to limit the provisions of COAA to only correctional officers. The difference between correctional officers and the civilian employee population can be seen by referring to other provisions of the Rhode Island General Laws. Under G.L. 1956 § 12-7-21 et seq., "correctional investigators and correctional officers of the Rhode Island Department of Corrections" are defined as "Peace Officers." As such, correctional investigators and correctional officers have the power to arrest as provided under that statute. See id. The correctional officer position is also a law enforcement officer for the purpose of the Fair Employment Practices Act, G.L. 1956 § 28-5-6, to the extent that their responsibilities include "the duties of employees assigned to guard individuals incarcerated in any penal institution." This definition relates to the pre-employment criminal background checks that correctional officers must undergo.See id. In both statutes, only correctional officer *Page 15 
positions are subject to the relevant statutory language. These statutory provisions do not extend to the civilian positions.
Additionally, the COAA is not alone among the Rhode Island General Laws that confer binding arbitration upon public safety and security personnel. The Legislature has established binding arbitration as a means of resolving labor disputes, including wages, for these classes of employees. A brief review of the language of these Arbitration Acts demonstrates the Legislature's clear intent in identifying certain categories of employees as essential to public safety and is therefore prohibited from strikes, slowdowns or work stoppages.
For example, the Firefighters Arbitration Act, G.L. 1956 § 28-9.1 et seq., provides "the protection of the public health, safety and welfare demands that the permanent uniformed members, rescue personnel of any city or town, emergency medical services personnel of any city or town, and all employees of any paid fire department in any city or town, and all employees of any paid fire department of any city or town not be accorded the right to strike or engage in any work stoppage or slowdown." Sec. 28-9.1-2. The Definitions section of the Firefighters Arbitration Act specifically defines "firefighters" as "permanent uniformed members, rescue service personnel of any city or town, emergency medical services personnel of any city or town, any fire dispatchers of any city or town, and all employees with the exception of fire chiefs of any paid fire department in any city or town within the state." Sec. 28-9.1-3. Additionally, the State Police Arbitration Act, G.L. 1956 § 28-9.5 et seq., provides in relevant part that "the protection of the public health, safety and welfare demands that the full-time state police officers . . . not be accorded the right to strike or engage in any work stoppage or slowdown." Sec. 28-9.5-2. The Definitions section of this Act defines a "state police officer" as a "full-time state police officer of Rhode Island from the rank of trooper up to and including the *Page 16 
rank of sergeant." Sec. 28-9.5-3(2). The 911 Employee Arbitration Act, G.L. 1956 § 28-9.6 et seq., notes "the protection of the public health, safety and welfare demands that the full-time 911 employees . . . not be accorded the right to strike or engage in any work stoppage or slowdown." Sec. 28-9.6-2. The Definitions section of this Act defines "911 employees" as "the full-time supervisors, assistant supervisors, and telecommunicators, of the 911 statewide uniform emergency telephone system pursuant to Chapter 21.1 of title 39." Sec. 28-9.6-3. The Municipal Police Arbitration Act, G.L. 1956 § 28-9.2 et seq., provides "the protection of the public health, safety and welfare demands that the full-time police officers of any paid police department in any city or town not be accorded the right to strike or engage in any work stoppage or slowdown." Sec. 28-9.2-2. The Definitions section of this Act defines "police officer" as "full-time police officer from the rank of patrolman up to and including the rank of chief, including policewoman, of any particular police department in any city or town within the State." Sec. 28-9.2-3.
Reading these Arbitration Acts as a whole makes clear that the General Assembly finds correctional officers essential to public safety, health, and welfare. If the General Assembly intended to include civilian personnel under the scope of the COAA, it could have expanded the statute in such a manner. See HeritageHealthcare Services, Inc. v. A. Michael Marques, Director and RhodeIsland Department of Business Regulation, No. 2008-160, slip op. at 10-11 n. 13 (R.I., filed Jan. 6, 2011) (when legislative silence is confronted, trial judges must remain vigilant against the temptation to fill in a legislative gap.) In this instance, the General Assembly declined to expand upon the definition of a "correctional officer" beyond that of "a full time correctional officer" as it did in similar sections of the other Arbitration Acts. This language *Page 17 
therefore establishes clear legislative intent that only full-time correctional officers are included in the provisions of the COAA.See § 28-9.7.
Other jurisdictions have also recognized the necessity of barring strikes of employees that are essential to public safety and security. In Lincoln Park Detention Officers v. LincolnPark, 256 N.W. 2d 593 (Mich. 1977), detention officers employed in the city police department were found unable to avail themselves of compulsory arbitration under a state statute which declared strikes by employees of public police departments to be illegal. The court ruled in this case that the statute encompassed police officers and those subject to the hazards of police work.Id. The court responded that to hold otherwise would mean that any employee of the police department from janitor to secretary would be encompassed within the scope of the statute.Id. at 596. While the Court acknowledged that a strike by non-critical police department personnel could burden the police department, the court ruled that the statute was not meant to be all-encompassing. Id. Furthermore, in American Federationof State, County Municipal Employees v. Executive Dept.,629 P.2d 1228 (Mich. 1981), the court ruled that employees of a the prison other than guards, corporals, and sergeants were not "prison guards" within the meaning of the statute prohibiting public workers from striking. Noting the policy behind the prohibition on striking was the protection of public safety, the court concluded that the legislature intended to include within this prohibition only those public employees whose job duties were such that a strike would cause a public danger or threat. Id. at 1240-41. While the court acknowledged that employees other than correctional officers, corporals, and sergeants had security responsibilities, the court noted that these employees were not hired to maintain prison security, but rather were to perform security functions only as an ancillary requirement to their primary job. Id. at 1241. Again, in American Federation of State,County Municipal *Page 18 Employees v. Executive Dept., the relevant statutory language specifically provided for "public employees included in an appropriate bargaining unit which provides for resolution of a labor dispute by referral to final and binding arbitration."Id. at 1242-43. In the instant case, a review of the COAA reveals that such statutory language providing for public employees to be included in arbitration proceedings due to their inclusion in an appropriate bargaining unit is notably absent.
 2 The Doctrine of "Noscitur a sociis"
Similarly, in Rhode Island, well established canons of statutory interpretation also require this Court to give meaning to every sentence in a statute. See Local400 International Federaion of Technical and Professional Engineers v. Rhode IslandState Labor Relations Board, 747 A.2d 1002, 1005 (R.I. 2000). Statutory language, therefore, should not be viewed in isolation, but rather must be looked at as a whole. Bucki v. Hawkins,914 A.2d 491, 497 (R.I. 2007) (quoting In re Brown,903 A.2d 147, 149 (R.I. 2006)). The doctrine of noscitur asociis or "it is known from its associates" stands for the proposition that "the meaning of questionable words or phrases in a statute may be ascertained by reference to the meaning of other words or phrases associated with it."Black's Law Dictionary 1060 (6th ed. 1990). In the case ofState v. DiStefano, the Rhode Island Supreme Court adopted this approach. 764 A.2d 1156, 1161 (R.I. 2000). The Court analyzed the juxtaposition of §§ 31-27-2.2 and 31-27-2.3 of the Rhode Island General Laws to aid them in ascertaining the meaning of the phrase "none shall be given" (referring to the tests described in § 31-27-2) which appears in § 31-27-2.1 as a statutory restriction prohibiting law enforcement officials from obtaining a warrant to seize a nonconsenting motorist's blood for alcohol or drug testing. See id. *Page 19 
Application of this doctrine to the current matter makes evident that it was not the intent of the legislature to apply the term "full-time correctional officer" to civilian job classifications. The stated purpose of the COAA is to afford "the protection of the public health, safety and welfare [which] demands that the full-time correctional officers . . . not be accorded the right to strike or engage in any work stoppage or slow down.See § 28-9.7-2(a). Certainly there are numerous members RIBCO's bargaining units that are not essential to the public health safety, and welfare of the Rhode Island citizenry. The language of the COAA goes on to state that "the establishment of this method of arbitration . . . shall be deemed to be a recognition solely of the necessity to provide some alternative mode of settling disputes where employees must as a matter of public policy be denied the usual right to strike." See § 28-9.7-2(c). While the civilian members of RIBCO's bargaining units certainly play an important role in prison administration, public policy in no way demands that they forfeit their usual right to strike. See id.
Furthermore, Section 28-9.7-10 of the COAA guides arbitrators in the execution of their duties; this section instructs them to use a number of factors when weighing their binding decision. These factors include: the comparison of wage rates of hourly conditions of employment with those of correctional officers in other states, hazards of employment, physical qualifications, educational qualifications, job training and skills.See § 28-9.7-10. If this multi-factor test were to apply to all members of RIBCO's bargaining units, the COAA would become unworkable. The education, job training, skills, and physical requirements involved in many civilian jobs are distinctly different than those requirements imposed on correctional officers. If the arbitrators were to apply these factors to non-correctional officers when weighing their binding decision, the statute would reach an absurd result. This Court will not construe a statute *Page 20 
to reach an absurd result. Shephard v. Harleysville WorcesterIns. Co., Inc., 944 A.2d 167, 170 (R.I. 2008).
To further illustrate the point, the range of prevailing wages for nurses, accountants, x-ray technicians, typists, psychologists, and correctional officers is so large that if these positions were all to be considered correctional officers for purposes of the COAA, the board of arbitrators would have no real constraints on determining what prevailing wages for correctional officers are. The same holds true for both education and physical requirements. If the COAA were to apply to all members of RIBCO's bargaining units, the General Assembly will have engaged in an unconditional delegation of legislative power. See e.g. City of Warwick v. WarwickRegular Firemen's Association, 256 A.2d 211 (R.I. 1969) (statutory limitations on actions of board of arbitrators appointed pursuant to Firefighters' Arbitration Act were sufficient to meet constitutional requirement that delegated power be confined by reasonable norms or standards). If, however, the COAA is construed to apply only to correctional officers, then the arbitration board is limited in its exercise of the power delegated to it.Id. Specifically, in this instance, the arbitration board would be limited to reaching decisions relating to objectives of public safety. Id. The Rhode Island Supreme Court will construe statutory language to avoid a finding of unconstitutionality. Hometown Properties, Inc. v. Fleming,680 A.2d 56, 60 (R.I. 1996) (courts seek to adopt an interpretation that avoids a finding of unconstitutionality). The comprehensive limitations on factors that may be considered by the arbitration board when making an award is seemingly sufficient to meet the constitutional requirement that delegated power be confined by reasonable norms and standards. Id.
RIBCO argues that a strict interpretation of the COAA will divide the bargaining units and render it ineffective for the purposes of collective bargaining. Even assuming arguendo, as *Page 21 
RIBCO asserts, that the COAA imbues rights to some members of the bargaining units that others do not possess; bargaining units are not sacrosanct. See Rhode Island Public TelecommunicationsAuthority v. Rhode Island State Labor Relations Bd.,650 A.2d 479, 487 (R.I. 1994). In Rhode IslandPublic Telecommunications Authority, the Rhode Island Supreme Court held that intern producers at the state's public television station who received minimum wage salaries, no form of employee benefits, worked between ten to thirty hours per week at the station, and who were hired through self-initiated solicitation, did not share mutual interests in wages, hours, and other conditions of employment with members of the existing collective bargaining unit for State employees, and as such, were disallowed from accreting into the bargaining unit. See id.
 D Legislative Authority
It is also clearly within the General Assembly's authority to determine the scope and organization of bargaining units.See e.g. Town of Lincoln v. Lincoln Lodge No. 22,660 A.2d 710, 715 (R.I. 1995). In Town of Lincoln, the Town of Lincoln brought a declaratory judgment action seeking clarification of alleged conflicts among statutes including police chiefs in local bargaining units. See id. The Town of Lincoln contended that G.L. § 28-7-14, authorizing representatives designated or selected after an election to be the exclusive representative of all employees in a bargaining unit, and G.L. § 28-7-15, authorizing the Rhode Island State Labor Relations Board to make a determination as to the "appropriate" unit for the purpose of collective bargaining, amounted to an unlawful and unconstitutional delegation of power the Rhode Island State Labor Relations Board. Id. The Town of Lincoln maintained that this legislation impinged on the Town's right to structure local government, in violation of *Page 22 
art. 13 sec. 4 of the Rhode Island Constitution. Id. at 720. In rejecting the Town's argument, the Supreme Court expressly held that the General Assembly's enactment of the Policeman's Arbitration Act specifically granted the right to participate in local bargaining units to the chiefs of police. Id. at 720. Additionally, the Town of Lincoln argued that the police chief's inclusion in Lodge 22 conflicted with article 3, section 7's[3]
directive that "public officials and employees . . . avoid the appearance of impropriety." Town of Lincoln, 660 A.2d at 715. The Rhode Island Supreme Court noted that: "[t]he General Assembly remains a reservoir of all power that has not been specifically divested or prohibited in express terms by the Rhode Island and Federal Constitutions. With these principles in mind, we are of the opinion that section 7 [of article 3 of the Rhode Island Constitution, imposing an ethical obligation on public officials and employees], does not limit the General Assembly's power to determine the scope and organization of the bargaining unit representing police officers in the instant case." Id. The Supreme Court declined to hold that the police chief's inclusion in the bargaining unit violated the constitutional mandates given the specific authorization contained within R.I.G.L. §§ 28-9.2-3 and 28-9.2-5.Id. In addition to the express provisions of the aforementioned sections of law[4], the Supreme Court *Page 23 
noted, after reviewing the Town's Charter that the powers of the chief of police were not of such a substantial nature as to be violative of the recently enacted Code of Ethics contained in Chapter 14 of title 12 of the General Laws. Id. at 717-18.
 E Jurisdiction
Keeping the aforementioned principles in mind, venue for and power to determine the appropriateness of the composition of a bargaining unit is vested with the State Labor Relations Board pursuant to G.L. §§ 28-7-14, 28-7-15, and 28-7-16. Either party may petition to the State Labor Relations Board in order to reclassify the bargaining units or alternatively seek an amendment to the COAA itself.
In arriving at its decision, this Court notes that there is no language in Rhode Island General Laws §§ 28-7-14, 28-7-15, 28-7-16, and 28-7-17 that excludes judicial activity in this area. A declaratory judgment is a discretionary remedy which is recognized based on the existence of another remedy, the availability of other relief, and the fact that a question may be readily presented at trial. See Berberian,114 R.I. 269, 332 A.2d 121. The Uniform Declaratory Judgments Act, (Act), specifically provides in relevant part that the superior court "shall have power to declare rights, status, and other legal relations whether or not further relief is or could *Page 24 be claimed." G.L. § 9-30-1. (Emphasis added). However, as previously noted, factors to be considered in determining whether or not to grant declaratory relief include "the existence of another remedy, the availability of other relief, the fact that a question may readily be presented in an actual trial. . . ." SeeBerberian, 114 R.I. 269, 332 A.2d 121.
In the instant case, RIBCO has filed a complaint seeking a declaratory judgment only. It is important to note that there is no count requesting preliminary or injunctive relief. The pleadings further reflect that the State, in its answer, opposes the requested relief but has not filed a counterclaim seeking a countervailing declaration. The Rhode Island Supreme Court has consistently ruled that "a party should not be granted relief that it did not request." Providence Journal Co. v. ConventionCenter Authority, 824 A.2d 1246, 1248 (R.I. 2003) (holding that the trial justice erred when she ordered unrequested redactions of certain information from several contracts (citing DirectAction for Rights and Equality v. Gannon,713 A.2d 218, 225 (R.I. 1998))).[5]
The existence of another remedy and the availability of other relief are both present in the current matter. SeeBerberian, 114 R.I. 269, 332 A.2d 121. Notwithstanding this Court's analysis of the relevant statutory language, this Court must remain mindful of the expertise[6] of the State Labor Relations Board as well as the constitutional and policy[7] prerogatives of the *Page 25 
General Assembly. It is important to note this decision does not undermine either parties' ability to petition the State Labor Relations Board pursuant to R.I.G.L. §§ 28-7-15 and 28-7-16 for a determination regarding the appropriate composition of the RICBO bargaining units, or alternatively, to seek a legislative amendment. By referring the issue to the State Labor Relations Board, this matter may proceed as the Legislature and the long history of administrative law intended; beginning at the administrative level, and thereafter, if necessary, proceeding through the well laid out statutory and regulatory scheme. See Sousa v. INS, 226 F.3d 28 (1st Cir. 2000). Jurisdiction pursuant to § 9-30-1 is entirely discretionary, and this Court finds the instant matter is suited for the administrative hearing level at this juncture, in accordance with the longstanding exhaustion doctrine. Greenwich Bay YachtBasin Associates v. Brown, 537 A.2d 988, 993 (R.I. 1988). The expertise of the State Labor Relations Board is better suited at this point to handle these issues. See,James v. United States Dep't of Health Human Servs.,824 F.2d 1132, 1138 (D.C. Cir. 1987) (denoting the importance of the expertise at the administrative level). As noted by Justice Kelleher, case law supports the idea that:
 "(1) while the declaratory judgment statute is remedial legislation, it is not to be regarded as an automatic substitute for administrative proceedings; (2) the Legislature never intended that a declaratory judgment action could be used to usurp or replace specific administrative relief, especially when the initial decision-making responsibility has been vested in an administrative tribunal; and (3) courts should not interfere with the administrative process by assuming jurisdiction of declaratory judgment actions." Taylor v. Marshall, 119 R.I. 171, 182-83, 376 A.2d 712, 718 (1977) (Kelleher, J., dissenting).
While this Court could invoke jurisdiction pursuant to § 9-30-1 using its discretion, at this point in the proceedings, and notwithstanding this Court's analysis of the relevant statutory language of the COAA, this Court finds the current matter should be completed through the administrative process, noting the jurisdiction and expertise of the State Labor Relations Board *Page 26 
to determine the proper composition of RIBCO's bargaining units and therefore declines to issue or otherwise render declaratory relief at this juncture.
 IV CONCLUSION
After reviewing the evidence and the memoranda submitted by the parties, this Court denies Plaintiff's request for declaratory judgment pursuant to § 9-30-1. Counsel shall submit an Order consistent with this Decision.
[1] All of the positions described as civilian positions within the bargaining unit, notwithstanding the precise words or respective title of the position. These positions are not staffed by sworn correctional officers.
[2] The Occupational Outlook Handbook, a publication of the Bureau of Labor Statistics within the U.S. Department of Labor, is a nationally recognized source of career information. TheHandbook is revised every two years.
[3] The Rhode Island Constitution provides in relevant part that:
 "The people of the State of Rhode Island believe that public officials and employees must
adhere to the highest standards of ethical conduct, respect the public trust and the rights of all persons, be open, accountable and responsive, avoid the appearance of impropriety and not use their position for private gain or advantage. Such persons shall hold their positions during good behavior." R.I. CONST. art. III, § 7 (Emphasis added).
[4] Rhode Island General Laws §§ 28-9.2-3 and 28-9.2-5, respectively, provide:
 "§ 28-9.2-3 Definitions. — As used in this chapter the following terms, unless the context requires a different interpretation, have the following meanings: . . . (2) "Police officer" means a full-time police officer from the rank of patrolman up to and including the rank of chief, including policewomen, of any particular police department in any city or town within the state . . .
 § 28-9.2-5 Recognition of bargaining agent. — The organization selected by the majority of the police officers in any city or town shall be recognized by the city or town as the sole and exclusive bargaining agent for all of the police officers of the city or town police department." (Emphasis added).
[5] A thorough discussion of this issue is set forth inNye v. Brousseau, 992 A.2d 1002, 1011 (R.I. 2010).
[6] There is a presumption of expertise accorded to an administrative agency or a department. Judicial deference to an administrative agency decision is proper and necessary when the agency's decision is based on highly specialized knowledge of a particular matter within the agency's expertise. Robert E.Derecktor of Rhode Island, Inc. v. U.S.,762 F.Supp. 1019, 1022 (D.R.I. 1991).
[7] See e.g., Retired Adjunct Professors of RI v.Almond, 690 A.2d 1342, 1346 (R.I. 1997) (principal function of legislature is to make policy); Chambers, 935 A2d at 965 ("The role of judicial branch is not to make policy, but simply to determine the legislative intent as expressed in the statutes enacted by the General Assembly"). *Page 1